(42 South. 329.)

No. 15,831.

NEW ORLEANS ACID & FERTILIZER CO. et al. v. O. GUILLORY & CO. et al.

(March 26, 1906. On Rehearing, Nov. 26, 1906.)

1. FRAUDULENT CONVEYANCES — ACTION TO SET ASIDE.

For making out a prima facie case in the revocatory action and action en declaration de simulation, it does not suffice for plaintiff to prove that the reprobated sale was made. Plaintiff must, in addition, show facts which are sufficient to throw doubt upon the good faith of the purchaser in the revocatory action, or upon the reality of the transaction in the action en declaration de simulation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Fraudulent Conveyances, §§ 867, 904–908.]

On Rehearing.

2. SAME—EVIDENCE.

A transaction between an insolvent and his son-in-law, in the form of a cash sale of real estate, followed a few days later by the payment of an unsecured note due by the vendor to the vendee, will be considered, in the absence of satisfactory explanation, as a disguised giving in payment in fraud of creditors.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Fraudulent Conveyances, §§ 329–332, 887.]

3. BANKRUPTCY—TRUSTEE—INTERVENTION IN ACTION.

A trustee in bankruptcy, under the United States bankrupt act of 1898, as the representative of all the creditors, has the right to intervene in a pending revocatory action in a state court and prosecute the same to final judgment for the benefit of the bankrupt estate.

4. SAME—BANKRUPT FIRM.

Where a commercial firm goes into bankruptcy, it is a proceeding against each and every member, and both the firm and individual assets must be administered in the bankruptcy.

5. SAME—RIGHTS OF INDIVIDUAL CREDITOR.

The right of an individual creditor to be paid by preference out of individual assets must be enforced in the bankruptcy proceedings. Such a right is no defense in an action in a state court by partnership creditors to annul a sale as operating an undue preference.

Provosty, J., dissenting.

(Syllabus by the Court.)

Appeal from Sixteenth Judicial District Court, Parish of St. Landry; Edward Taylor Lewis, Judge.

Action by the New Orleans Acid & Fertilizer Company and others against O. Guillory & Co. and others. Judgment for defendants, and plaintiffs appeal. Defendants Samuel Haas and John A. Haas also appeal. Reversed in part, and amended, and judgment rendered.

William Joel Sandoz, Kenneth Baillio, and T. M. & J. D. Miller, for appellants New Orleans Acid & Fertilizer Co. and others. Lewis & Lewis, for appellants Haas. Edward Benjamin Du Buisson (Léon Austin Fontenot, of counsel), for appellees.

PROVOSTY, J. This suit is brought to set aside as simulated, or at any rate fraudulent, three sales made to the three defendants, separately, by O. Guillory, a member of the merchantile firm of O. Guillory & Co., whereof plaintiffs are creditors.

The allegations are the usual ones of indebtedness, insolvency, the making of the sale for the purpose of defrauding creditors or giving an unfair preference to some of them; also that the price was less than four-fifths of the real value.

At the time of the sales, 7th and 8th December, 1904, O. Guillory & Co., was a going merchantile firm at Eunice, La., composed of O. and O. E. Guillory and Ambroise Lafleur. The firm was holding a large amount of cotton, and there had been recently a slump in the cotton market. O. E. Guillory and Am-

broise Lafleur had no individual property. O. Guillory had 806 acres of prairie land, usually cultivated in rice. The land was well fenced and had some houses or cabins on it. He had also a steam cotton gin in the town of Eunice, with the lot or lots on which it stood; also another lot, having on it the store building in which the firm carried on its business and a small dwelling house. In the October preceding the firm had written to one of the plaintiffs, asking indulgence, and representing that its indebtedness was $7,000, as against $20,000 of assets.

On December 7, 1904, O. Guillory and his wife and the defendant Alexander Miller, who is their son-in-law and lives just outside of Eunice, came together in a carriage from Eunice to Opelousas, the parish seat, a distance of 30 miles. On that day Guillory sold the 806 acres of land to Samuel and John A. Haas for $2,000 cash, plus the assumption of a mortgage of $6,000 and interest, resting on the property and represented by three notes. Samuel Haas lives at Bayou Chicot, 35 miles from Eunice, and John A. Haas at Opelousas, which, as just stated, is 30 miles from Eunice. Samuel Haas and John A. Haas are father and son, and men of large means, who to some extent make a business of buying lands cheap when opportunity offers and holding for higher prices.

On the same day, and before the same notary, Guillory sold to Alexander Miller, for $7,500 cash, the steam cotton gin and the lot or lots on which it stood. Miller says that after the sale of the land had been consummated Guillory offered to sell to the Haases the steam cotton gin, and that they declined to buy, and that thereupon he (Miller) proposed to them that he and they make the purchase together, and, they declining, he bought it himself. He says the object of his coming to Opelousas that day was to pay his taxes. He says, further, that they drove back to Eunice the same day, and that he

the same evening went to his house, and got the $7,500, and paid it to Guillory. At the time of this sale Miller held the past-due note of Guillory for $3,000. He says Guillory paid him this note on the 12th, a few days after the sale. Miller is a farmer without education, but admittedly a man of considerable means, all of his own making. The witness put upon the stand by plaintiff to prove he could not have had at his house, or readily procured without giving security, so large a sum as $7,500, proved rather the opposite. Miller says he would not have bought the property if he had thought Guillory was making the sale for the purpose of defrauding his creditors; that he knew Guillory was holding an immense amount of cotton, and that there had been a terrible slump in the price of cotton, and that Guillory told him that in order to keep this cotton he needed all the money he could get; that this was the reason why he did not deduct from the $7,500 the amount of his note.

On the next day, December 8th, Guillory sold the store building and the small dwelling house and the lot or lots on which they stood to Francois E. Savoie for $3,500 cash. The sale was made before the local notary, Mr. Dardeau. Savoie lives about six miles from Eunice. He is a farmer and stockraiser, uneducated. He cannot tell what properties he now owns. He owns, he says, "about 400 or 500 acres of cultivable land, or maybe 800, on which he has seven families. He says he owns, as we understand. in addition, 500 arpents in pasture land; also in Eunice one acre of unimproved land, which cost him $200, and two improved lots. He admits that he is a debtor on a number of notes for small amounts secured by vendor's privilege on different tracts of land bought by him at different times, upon which he is paying interest at 8 per cent., and upon which he has been obtaining extensions.

The notary before whom the act of sale was passed testifies as follows:

"Mr. Savoie pulled out a roll of bills after the sale. It looked to me like a roll of bills of $5,000. He unrolled it and counted. He said, 'I want you to count it.' I counted the money. Mr. Olivrel Guillory was standing by me and counted the same money right behind me. There was $1,000 in it. I said: 'There is lacking $2,500. What will you do about it?' Mr. Olivrel said, 'He will give me a duebill or a note payable in eight or ten days, as he wants.' Mr. Savoie answered, 'I will pay you within three days.' So I made the note payable one day after the date for the sum of $2,500, with interest at the rate of 8 per cent. from date."

Savoie testifies he had the other $2,500 in his house and paid it the next day. Touching the source of the money he testifies as follows:

"I had collected different sums, $850, for some cattle that I sold for my mother-in-law. I also kept a little market, and collected from $500 to $600, and then, besides that, I sold to the butchers a considerable amount that I don't remember that I have marked down at home. I can't mark it myself, but I have it marked.

"Q. Mr. Savoie, was it from these collections that you have mentioned that you realized the money to pay Mr. Guillory?

"A. Not absolutely that. I had other money. It was mixed with other money.

"Q. Can't you give us a statement of where you got the money, aside from these collections that you have mentioned?

"A. I could have it at the house.

"Q. Where did you get the money which you claim to have had at your house?

"A. From working and trafficking."

He says, further, that he has been in possession ever since: "I bought in December, and in January I commenced to collect rent. We fixed the price at $30 a month right after the sale." He does not say whom, besides himself, he means by we; but a little later in his testimony he says that the store is not occupied now, but has been retained, and he is getting his rent all the same; that O. E. Guillory, of the firm of O. Guillory & Co., representing to him that he was acting for other people, asked him the preference on the store, and that he gave it to him; that Johnny White wanted to rent the dwelling house, but "I told him I had left it with O. E.

Guillory to rent for me, and to see him about it"; that this house is rented; and that he got at first $5 rent, but now is getting $6. He does not say to whom. He further testified as follows:

"Q. Who is it that is to occupy that store from now on?

"A. Yves Guillory asked me the preference on the store, and I told him he could have it. He told me that he was representing other people.

"Q. When you say Yves Guillory, you mean O. E. Guillory, member of the old firm of O. Guillory & Co.?

"A. Yes; I mean O. E. Guillory, of the firm of Guillory & Co.

"Q. Do you know who composes the firm who is to run that business?.

"A. I know. the names of one or two who are to occupy the store.

"Q. Who are they?

"A. Theodule Guillory, Pierre Guillory, and one of the Lafleurs, and perhaps myself.

"Q. What relation are Pierre Guillory and Theodule Guillory to O. Guillory?

"A. Brothers.

"Q. What relation is Lafleur (Henry Lafleur) with Ambroise Lafleur, who was a member of the same firm of O. Guillory & Co.?

"A. I don't know what relation they are. I don't know how nearly related they are."

The parties here referred to are the charter members of a limited company organized in July, 1905, under the name of "Eunice Mercantile Company, Limited," for the declared purpose of carrying on a mercantile business at Eunice. One of the charter provisions is that the affairs of the company shall be conducted by a manager, who shall be authorized to sue and upon whom process shall be served, and that until otherwise provided O. E. Guillory shall be manager.

Whether at the date of the sales the firm of O. Guillory & Co. had disposed of the cotton it had been holding theretofore is not shown by the record. However, on the 13th of December, five days after the sales, it wrote to one of its creditors that owing to the recent slump in the price of cotton it was not able to meet its obligations, which were $18,403.41, as against $7,000 of assets. On January 9, 1905, it wrote to the attorneys of the same creditors, stating that its case

was one of "plain loss and ruin," and offering a settlement at 25 cents on the dollar, and submitting the following statement:

| | | |
|---|---:|---:|
| October liabilities.................. | $ 7,943 00 | |
| October assets....................... | | $19,687 00 |
| W. B. Thompson & Co. since for cotton ............................ | 42,000 00 | |
| This cotton sold for................ | | 36,382 00 |
| F. Gumbel & Co. since for cotton ............................... | 1,090 00 | |
| Collections invested in cotton.... | 17,000 00 | |
| | $68,033 00 | $56,069 00 |
| | $56,069 00 | |
| | $11,964 00 | |
| Our present assets remaining from our original $19,687.00.... | 6,645 00 | |
| | $18,609· 00 | |
| Liabilities ......................... | | $18,609 00 |
| Assets .............................. | | $ 6,645 00 |

On April 28th, three months after the sales, the firm made a surrender in bankruptcy. The debts are put down at $18,629.34. Schedule B, showing whether there were any assets, was not offered in evidence.

Counsel for plaintiffs say that the embarrassed condition of the firm had been a topic of public comment and conversation in the neighborhood. But the only evidence referred to in support of that statement is the testimony of the notary, Mr. Dardeau, before whom the sale to Savoie was passed, which testimony is as follows:

"Q. Mr. Dardeau, did you know of the embarrassed circumstances of Guillory & Co. about the time that they sold this property to different people?

"A. Heard talking among the neighbors.

"Q. It was generally understood in that neighborhood that there was something the matter then, I believe, was it not?

"A. Yes; but I pay so little attention to what I hear. Unless I am perfectly satisfied, or I know something about the business, I pay little attention.

"Q. What you heard of it was gotten from general talk?

"A. Yes; general talk, and people that understood nothing about business. Only some of my neighbors going to town and making reports.

"Q. To what effect were those reports?

"A. That he had bought cotton at a high price, and, cotton going down, it put him in a straight; that he couldn't possibly pay all his debts right away.

"Q. Was it not already talked about that the firm was in failing circumstances?

"A. No, sir; they didn't talk about his failing then. Some persons supposed he was selling to settle."

This last answer would indicate that the neighborhood talk in question might have been after the sales had taken place—caused, perhaps, by the sales themselves. But, granting that it was before the sales, it does not necessarily show anything more than that the firm was carrying a large quantity of cotton and that the fall in the price of cotton put the firm in a position not to be able to pay "all its debts right away." The Haases, living 30 miles away, could not be presumed to have heard this neighborhood talk. Miller denies having known of the insolvency of Guillory. Savoie was not questioned on the subject.

Plaintiffs say in their brief that the $13,123.41 realized by Guillory from the three sales was enough, added to the other assets, to pay within a few hundred dollars the entire indebtedness of the firm. If so, it is not so clear that Guillory was insolvent before the sales. What made him insolvent was the selling of the property and the pocketing of the proceeds. But that was a condition brought on by the sales, and existing only after they had been made. Guillory individually is not shown to have owed a dollar, apart from the $3,000 note to his son-in-law, Miller, and the $6,000 mortgage assumed by the Haases.

Counsel for plaintiffs attach great significance to the fact that neither of the Haases went on the witness stand, although one of them, or possibly both attended the trial throughout. But why should they have gone on the stand until plaintiffs had proved something against them? Plaintiffs had contented themselves with alleging much against them and proving absolutely nothing.

Even if it were granted that Guillory was insolvent "within a few hundred dollars" at the time of the sale, there is absolutely no

proof whatever that the Haases knew it. And even if they had known that upon a full and final settlement of his affairs, including the affairs of the firm, Guillory would have been minus a few hundred dollars, would that knowledge have stood in the way of their purchasing from Guillory his plantation in perfect good faith? We think not.

It is not, as contended, when simulation has been "charged," that the burden of proof shifts to the defendant, but "when facts are shown sufficient to throw doubt upon the reality of the sale." King v. Atkins, 33 La. Ann. 1057. At the time the Haases made their purchase, O. Guillory & Co. was a going concern, whose insolvency no one can be presumed to have known; and O. Guillory himself was the owner of considerable property, unincumbered, excepting the $6,000 mortgage assumed by the Haases.

Counsel say that the acts of sale were not offered in evidence by defendants, but only by plaintiffs, and that plaintiffs' offer was restricted to the proof of rem ipsam, and that therefore the acts are not evidence of payment of the price, nor of delivery of possession. The restriction to rem ipsam cannot go to that extent. It means no more than that the party offering the document does not vouch for the verity of its recitals and does not intend to be bound thereby. But the court cannot shut its eyes to the recitals of the document and to the fact that it is authentic, and that therefore it is accompanied by delivery.

Plaintiffs would prove up their case against Miller out of the mouth of Miller himself. Miller says he had the $7,500 in cash at his house, and in that statement he is confirmed by Lewis, and we might add by plaintiffs' own witness Meyer. Counsel think it next to incredible that Miller could have made the trip to Opelousas and back, and passed the act of sale, and gone to his home and got the money and delivered it to Guillory, all in one day, as he says he did. But what is there improbable in the statement? Certainly there was ample time to do it in, if the roads were fairly good. Other similarly supposed improbabilites are pointed out in the testimony of Miller, as that he, a farmer and an uneducated man, with no experience in the ginning business, should have consented thus suddenly to make the purchase; that he should not have deducted from the $7,500 the $3,000 which his father-in-law was owing him. The latter circumstance would certainly have been highly suspicious, if unexplained; but Miller does explain:

"Because at the time of the sale of the gin my father-in-law had an immense amount of cotton on hand unsold, and there existed a terrible slump in cotton at the same time, and he told me that in order to keep his cotton till advance price he was in need of all the money, and, as I had loaned him the $3,000 on his simple note, I did not fear to wait for him; hence I gave him the whole amount."

Again, plaintiffs think that the burden was on Miller to show that Guillory did not continue in possession of the gin. But, the sale having been made by authentic act and the thing sold being an immovable, legal possession accompanied the act; and if, as a matter of fact, the vendor continued in possession, the burden was on the plaintiffs to show it.

We are clear that the sales to the Haases and Miller were genuine transactions, made in good faith on the part of the purchasers. The Haas transaction does not offer grounds even for the slightest suspicion. So far as the Miller sale is concerned, the fact that Miller was the son-in-law of Guillory, and especially that he traveled with him that day, furnishes ground for believing that he knew of the embarrassed condition of the affairs of his vendor; but he admits that he did, and explains that he attributed his father-in-law's pressing need of money to the fact that

his firm was carrying a large quantity of cotton and that a slump had recently occurred in the cotton market. So far as the record shows, Guillory had up to that time stood well, and the fact that Miller had lent him $3,000 on his personal note shows that he had confidence in him.

The transaction with Savoie, however, impresses us differently. In the first place, the description of the property in the act of sale has a suspicious looseness about it. A part of the property sold is described as "three-fourths of lot 1," without specification as to what particular three-fourths. In the next place, there was no change of possession. True, Savoie says that this continued possession was by virtue of a lease entered into "right after the sale"; but this leasing to the vendor is the usual expedient resorted to in cases of simulation, where it is inconvenient for the vendor to part with the possession of the property. The only difference in this case is that the lease was probably to the firm, and not to O. Guillory individually. The retention of the property for the use of the limited company, composed of the two brothers of the Guillorys, and of a Lafleur, relative of the Lafleur who was the third member of the firm of O. Guillory & Co., for the continuation of the same business at the old stand, shows that there was to be no real change of possession.

It is manifest that the same people intended to continue to carry on the same business on the same premises. If so, there is an inherent improbability that O. Guillory would have sold the premises if he could find some complaisant friend under whose name to hide it from his creditors; and it is shown that Savoie had lent himself to just such a transaction on one or more previous occasions.

And the improbability is all the greater from the fact that Guillory had his pockets full of cash from the sales of the preceding day and stood in no pressing need of ready money, such as might drive a merchant to sell the roof from over the head of his business.

The manner in which the price is said to have been paid furnishes ground for further suspicion and doubt. When a man is going before a notary to pass a cash sale of real estate, and he has the money at his house with which to make the payment, he carries it with him. If the price is to be $3,500, he does not take $1,000 and trust to luck that the vendor will deliver to him a cash deed to the real estate and take his duebill for the remaining $2,500. But if it so happened that he did such a thing, and that the vendor proved willing to take the duebill, he would surely say to his vendor, "I have the rest of the money at my house, and will get it and turn it over to you at once." He would not say, "I will pay you within three days."

To the question of the notary: "There is lacking $2,500. What will you do about it?" —it is Guillory who answers. He volunteers the statement—hastens, apparently, to make it, without waiting to hear what Savoie has to say: "He will give me a duebill or a note payable in eight or ten days, as he wants." Had the transaction been a real one, he would have waited to hear what Savoie had to say, and, upon being assured by Savoie that he had the money at his house, he would either have required Savoie to go and get it, or, at any rate, would have fixed a much earlier time for the payment than eight or ten days.

Savoie declared, on the witness stand, that he would not take $5,000 for the property, "because I don't want to sell it. When I buy property it is to keep it." The reason thus assigned for the unwillingness to sell the property at a profit of $1,500 may have been the true one; but, judged by common experience, and that is what a court must

judge by, it was not. If a man who has bought a piece of property for $3,500 refuses to sell it seven months afterwards for $5,000, the reason must be that it has increased in value more than the $1,500, or that he is actuated by some sentimental motive, or that he has some special need of the property. If, in the absence of any of these motives, he still refuses to sell it, some other motive must be looked for. The court cannot but suspect very strongly that the motive which actuated Mr. Savoie in this case was that he was not the owner of the property, and hence could not have sold it at any price.

The account that Savoie gives of how he came to have the $3,500 at his house is not oversatisfactory. Indeed, the case shows weakness at every point at which simulation usually sticks out.

The testimony of Miller was taken by commission. The procès verbal of the execution of the commission reads as follows:

"Oath.

"The State of Louisiana, Parish of Lafayette.
"New Orleans Acid and Fertilizer Co. et al. v. O. Guillory et al.

"You solemnly swear that the answers to be given by you to the interrogatories and cross-interrogatories to be propounded by me to you in an action now pending before the Hon. E. T. Lewis, judge of the Sixteenth Judicial District court in and for the parish of St. Landry, state of Louisiana, in New Orleans Acid and Fertilizer Co. et al. v. O. Guillory & Co. et al., shall be the truth and nothing but the truth. So help you God.

"Sworn to and subscribed before me this 21st day of July, A. D. 1905.
          "[Signed] Alexandre Miller.
"[Signed] O. P. Gilbeau, Notary Public.
"Filed 7/22/1905. Alfred Pavy, Dt. Clk.

"The State of Louisiana, Parish of Lafayette.

"To the Hon. Sixteenth Judicial District Court in and for the Parish of St. Landry, La.: As per annexed commission from your Hon. court, and after having notified the within named Alexandre Miller, and after having sworn him according to law, the said witness, Alexandre Miller answers the interrogatories and cross-interrogatories as follows."

Here follow the answers of the witness. The procès verbal then proceeds.

117 LA.—27

"I do most solemnly swear that I have answered all questions propounded to me to my best of knowledge and ability. So help me God.
"Sworn to and subscribed before me this 21st day of July, A. D. 1904.
          "[Signed] Alexandre Miller.
"[Signed] O. P. Gilbeau, Notary Public.

"I, O. P. Gilbeau, notary public in and for the parish of Lafayette, La., do hereby certify that Alexandre Miller, the within named witness, personally appeared before me on the 21st day of July, 1905, and was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth.
"That the following deposition was reduced to writing by me and by said witness.
"Subscribed in my presence on the 21st day of July, A. D. 1905.
"[Signed] O. P. Gilbeau, Notary Public."

The evidence was objected to on the following grounds:

"First. That the procès verbal of the officer does not show that the answers of the witness were taken down as given him, nor that the interrogatories had been read to him before or at the time his answers were given.
"Second. That the procès verbal of the notary recites that the depositions were written by him and the witness himself, who is a party to the suit; this appearing from the following two paragraphs in the procès verbal of the Notary, as follows (verbatim et literatim):
" 'That the following deposition was reduced to writing by me and by said witness.
" 'Subscribed in my presence on the 21st day of July A. D. 1905'
—this being contrary to law, and making the whole of the depositions inadmissible as evidence."

These objections were overruled by the court for the following reasons:

"First. Because the procès verbal shows when, where, and by whom the commission was executed, and that the witness was duly sworn, which, in the opinion of the court, is sufficient in law.
"Second. Because the court's reading of the clause in question is that the deposition was written by the notary and subscribed before him by the witness on July 21, 1905. Besides, the court takes cognizance that the deposition is entirely written in the same handwriting, which corresponds with that of the signature of the notary, and is entirely different from that of the signature of the witness. In the absence of countervailing proof, the court is bound to adopt the presumption, 'Omnia rite acta.' "

This ruling was entirely and evidently correct.

Passing to the contention that the value of the properties exceeded by one-fifth the price of the sales, we find that no attempt was made to substantiate that allegation in so far as the Miller sale is concerned, and that the proof fails in connection with the sale to the Haases. The price was $8,000, plus 8 per cent. interest from February 25th to December 7th on $6,000, say, $376, or a total of $8,376. One-fifth of this would be $1,675.20. In order to set aside the sale, then, on the ground of inadequacy of price, a value of $10,051.20, or $12.47 per acre, would have had to be shown. Now, if we exclude the testimony of Gus Fontenot, who does not say that lands in that neighborhood are worth $20 per acre (as plaintiffs would have it that he says), but that he does not know what they are worth, only he would not take $20 for his own in that neighborhood, and if we average the other witnesses, acording to the rule contended for by plaintiffs, we have, as representing the value of the lands in that neighborhood, an average of $11.83, or somewhat less than the amount requisite for setting aside the sale. Apart from this, the evidence is overwhelming that, owing to the presence of cane grass on this Guillory land, it is worth less than the average land of the neighborhood. Moreover, a number of acts of sale offered by defendants show that lands in the neighborhood have been sold for less than $12.47 per acre.

It is therefore ordered, adjudged, and decreed that the judgment appealed from, in so far as it dismisses the plaintiff's suit against Francois E. Savoie, be annulled and set aside, and that the plaintiff now have judgment against the said Francois E. Savoie, setting aside as simulated the sale made to him by Olivrel Guillory on the 8th day of December, 1904, of the following described property, to-wit:

"Three-quarters of lot 1 and the whole of lot 2, in block 12, in Eunice, La., together with all the buildings and improvements thereon; also lots 7 and 8, block 5, in Eunice, La., together with all the buildings and improvements thereon.

"Three-quarters of lot 1, block 12, acquired by vendor from Gus Fuselier, and lot 2, block 2, acquired by exchange with O. Guillory, Jr., and lots 7 and 8, block 5, acquired by vendor from J. J. Lewis,"

—and for the costs of this suit, in so far as occasioned by that part of the suit relating to the said Savoie, and that in all other respects the said judgment be affirmed.

## On Rehearing.

LAND, J. A rehearing was granted in this case as to Samuel Haas and John A. Haas, and as to Alexander Miller.

Plaintiff's contention is that in the sale to Samuel Haas and John A. Haas the price paid was less than the real value of the property by one-fifth, and they claim the right under article 1981 of the Civil Code "to annul the contract and take back the property on paying the price or the value of the consideration, with interest."

There is a dispute as to the total acreage of the plantation. Plaintiffs claim that as per deed the total area amounted to 880 acres, and as per assessment to 861 acres. Counsel for defendant contend that the total area on the face of the deed amounts to 827.17 acres. The largest subdivision, consisting of a section, originally contained 650 acres, but 4 acres and a strip "350 feet wide running along the north line of said section" had been previously sold. The deed conveying this strip is not in the record. The second and third tracts are described in the deed as "containing one hundred arpents, more or less." It is evident that it would require a survey to determine with accuracy the total acreage of the whole plantation. The importance of certainty as to total area is shown by the consideration that if we fix the average estimate of the witnesses as to value at $11.83 per acre, as was done in our former opinion, and assume the total

area to be 861 acres, the total value would be $10,185.63, or only $134.43 over one-fifth more than the price paid. This small excess would disappear entirely if the total area be reduced by 11½ acres.

As to the value per acre, we do not think that it can be satisfactorily ascertained by the purely mathematical process of dividing the total estimates of the witnesses by their number. Value is a matter of opinion, and the weight of opinion depends on knowledge of the property in question and of real estate values in the vicinity.

White, a witness for the plaintiffs, who had cultivated the Guillory plantation for several years, described the lowland, about one third of the whole tract, as "very poor land and poisoned with cane grass and wild rice," and "sorrier" than other land about that neighborhood. He described the balance of the place as good rice land, if water for irrigation could be obtained; there being no water supply on the premises.

Evariste Varine, another witness for the plaintiffs, described the low or marsh land as almost uncultivatable owing to cane grass, and as fit only for pasturage.

Augelien Freige and Edward Dardeau, witnesses for defendant, corroborate the testimony of the foregoing witnesses as to the inferior quality of the marsh or rice land on the Guillory plantation. They estimate the area of such land at 200 acres and its value at $5 or $6 per acre.

Several witnesses for plaintiff had never seen the Guillory plantation. Other witnesses knew the place in a general way, but do not seem to have known of the existence of this considerable area of inferior marsh land. Their estimates are based on the assumption that the Guillory place averaged in quality with other improved lands in that section of the parish. Witnesses who knew the actual conditions estimated the value of the tract as below the average. Thus Varine, while estimating good rice land at from $12 to $15 per acre, valued the Guillory tract at from $8 to $12 per acre. Dardeau estimated the value of the whole tract at $8 per acre. Freige, a witness for both parties, estimated the high land at $10 per acre.

The price per deed of sale is a fraction under $10 per acre. We agree with the district judge that the evidence fails to show that this price was less by one-fifth than the real value of the tract at the time.

The motion to remand to enable plaintiffs to adduce evidence to show that the cash portion of the price was $1,000 and not $2,000, as stated in the deed, is disposed of by the statement that plaintiffs knew of the existence of such alleged evidence before the trial in the district court, but were afraid to put the witness on the stand. We see no good reason to change our opinion as to the Haas transaction.

The trustee in bankruptcy was on his own petition made a party plaintiff, and was authorized by order of court to prosecute the suit to final judgment for the benefit of the bankrupt estate. Neither the capacity of the trustee nor his right to stand in judgment have been questioned. It is argued, however, by counsel for Miller, that the partnership alone was adjudged a bankrupt, and not the members as individuals, and that as Miller, under the bankrupt act of 1898, is entitled to be paid by preference over partnership creditors out of the net proceeds of the individual estate of O. Guillory, plaintiffs were not prejudiced by the payment of the note held by Miller out of the individual assets of the debtor. The answer to this contention is that the petition of the bankrupt shows that O. Guillory filed schedules of his individual debts and of his individual property. "Where a firm goes into bankruptcy, it is a proceeding against each and every member, and both the firm and individual assets must be administered in bankruptcy." Collier on

Bankruptcy, p. 60. Hence all rights of preference must be determined by the court having jurisdiction of the insolvency.

We shall now consider the transaction on its merits. Miller is the son-in-law of O. Guillory. On December 7, 1904, Guillory and Miller proceeded by private conveyance from Eunice to Opelousas, a distance of 30 miles, and after their arrival Guillory on the same day and before the same notary sold his plantation to the Haases and his gin plant to Miller. The latter admits that he did not pay the price of $7,500 in cash, as recited in the act of sale, but testifies that he returned to his home at Eunice and on the same day paid the price to Guillory. Miller testified that he had the sum of $7,500 and more in cash in his house. At the time of the sale, Miller held the demand note of Guillory for $3,000, dated January 18, 1904, bearing on its face no interest. This note was paid by Guillory on December 12, 1904, five days after the sale to Miller. On the next day, December 13th, O. Guillory & Co. wrote a circular letter to their creditors, announcing that the firm was unable to meet its obligations. This letter opens as follows:

"The recent slump in cotton caught us with a large lot of spots, which we were compelled to close out at an enormous loss."

On January 5, 1905, the firm rendered a statement to their creditors, showing liabilities $18,609 and assets $6,645, and proposed a compromise settlement at 25 cents on the dollar. It is not shown that O. Guillory used $1 of the money realized from the sale to Miller to protect the spot cotton of the firm held on December 7, 1904, and it appears that said cotton was sold and the firm advised of the sale on or before December 13, 1904.

Miller was the sole witness adduced to explain and sustain this singular transaction between him and his father-in-law. Miller's testimony was taken under commission, and is very brief. His story may be epitomized as follows: On December 7, 1904, he went with O. Guillory to Opelousas. Miller's sole object in making the journey was to pay his taxes, and he happened to be present when Guillory offered to sell his gin plant to Sam Haas. Miller at once proposed to Mr. Haas to buy the gin plant in partnership, but the latter declined on the ground that his money was tied up. Guillory then said to Miller: "You buy it. You have the money." Miller immediately accepted the proposition, but did not pay the cash then because his money was at home; but on the same day they returned, and Miller paid Guillory $7,500 in cash. Miller at the time held Guillory's note for $3,000 for money loaned, but nevertheless paid him the price in full upon his statement that he needed all the money to keep his cotton until prices advanced. The note, however, was paid by Guillory within a few days without any demand on the part of Miller.

Considering the interest of Miller in the result of this litigation, his relationship to Guillory, the ordinary motives which actuate men under like circumstances, and the unexplained voluntary payment of the note a few days after the sale, and probably out of its proceeds, all tend to the conclusion that the transaction was an indirect preference of the son-in-law over other creditors by a disguised giving in payment. Miller knew at least that Guillory was selling out his individual property, and that Guillory & Co. were in danger of financial loss by the fall in the price of cotton. Under the circumstances ordinary prudence dictated that Miller should take steps to collect or secure the note, and at the same time Guillory naturally desired to protect his son-in-law.

The sudden purchase of the gin plant by Miller and the payment of the note five days later were evidently parts of the same transaction, which cannot be rationally explained on any other hypothesis.

We therefore are of opinion that the transfer to Miller should be annulled to the extent of the amount of the note.

It is therefore ordered, adjudged, and decreed that the judgment appealed from, in so far as it dismisses the trustee's suit against Alexander Miller, be annulled, avoided, and reversed; and it is now' ordered, adjudged, and decreed that the trustee, William J. Sandoz, have judgment against the said Alexander Miller, revoking and setting aside to the extent of $3,000 the sale made to him by Olivrel Guillory, as per notarial act of date December 7, 1904, duly recorded, and as described in plaintiff's original petition in this suit; and it is further ordered that the property so conveyed be subjected to the payment of the judgment rendered herein in favor of said trustee to the extent of $3,000, and that the costs of suit in the district court be paid by Francois E. Savoie and Alexander Miller, except those incurred on the demand against the Haases, and that the costs of this appeal be paid by said trustee, the said Savoie, and the said Miller, one-third each; and it is finally ordered that our former decree herein, as thus amended, be reinstated and stand as the judgment of this court.

BREAUX, C. J., concurs in the decree.

See dissenting opinion of PROVOSTY, J., 42 South. 336.

PER CURIAM. The court declines to entertain a second application for rehearing in this case.