(67 South. 819)

No. 20376.

MUNCHOW v. MUNCHOW.

(Feb. 8, 1915. Rehearing Denied March 8, 1915.)

*(Syllabus by the Court.)*

HUSBAND AND WIFE ☞272—COMMUNITY OF ACQUÊTS AND GAINS—SETTLEMENT.

In the settlement of a community of acquêts and gains, the husband is not entitled to have credit for separate funds contributed by him to the community, except to the extent that the property of the community is thereby enhanced in value at the time of its dissolution; and this must be shown with reasonable certainty.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 1003–1007; Dec. Dig. ☞272.]

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Action by Mrs. Emile Munchow against her husband. From a judgment rendered on oppositions filed, plaintiff, and her attorney in his own behalf, appeal. Amended in part, affirmed in part, and remanded.

Martin H. Manion and E. Howard McCaleb, both of New Orleans, for appellant. Titche & Rogers, Chandler C. Luzenberg, and Dart, Kernan & Dart, all of New Orleans, for appellee.

O'NIELL, J. The plaintiff obtained a judgment against the defendant, decreeing a separation from bed and board, and ordering a settlement of the community of acquêts and gains which was dissolved by the judgment. The property of the community was sold under the orders of court, and the notary appointed to effect the partition prepared and submitted a projet of distribution, to which certain oppositions were filed by the defendant husband, and to which others were filed by the plaintiff. From the judgment rendered on these oppositions, the plaintiff, Mrs. Munchow, and her attorney in his own behalf, have appealed.

The plaintiff complains of the judgment ordering that the defendant husband, be paid $5,500 out of the community funds. That much was allowed of his claim of $6,059.71 which he asserted as a creditor of the community in his opposition to the distribution proposed by the notary. The credits claimed by the husband are as follows:

Amount loaned to the Mutual Loan & Building Company, before the marriage and collected after the marriage .......................... $1,000 00
Amount similarly loaned to and collected from the firm of Munchow & Son ........................ 500 00
Amount similarly loaned to and collected from Otto Walter, builder... 1,000 00
Five shares of Teutonia Bank Stock 500 00
Twenty-one shares of Mutual Building & Loan Stock at $25......... 525 00
One-half interest in the business of E. Munchow & Son................ 2,534 71
                                        ————
                                        $6,059 71

The plaintiff and defendant were married on the 30th of April, 1896. He was then the junior member of the firm of E. Munchow & Son, owning one-half interest in the slating or roofing business with his father, Ernest Munchow. An inventory of the business taken in January, 1896, showed assets amounting to $5,069.42 above liabilities. And, from the testimony of his father that the business was then prospering, the defendant claims that his half interest was worth fully $2,-534.71 at the date of his marriage. It seems that to this should be added a certain deed of trust worth $1,000, which belonged to the firm.

On the 2d of September, 1901, the partnership of E. Munchow & Son was dissolved by Emile Munchow's purchasing his father's interest in the business. The assets of the business, not itemized, but consisting of stock on hand, bills receivable, cash in bank, horse, wagon, and buggy, then amounted to $10,125.-96. The liabilities amounted to $156, leaving a value of $9,969.96. From this was deducted the $69.96 for bad accounts, leaving a net worth of $9,900. Ernest Munchow drew out and accepted as his half interest of $4,950 the following items, which were treated as belonging to the firm, viz.:

Promissory notes due the firm...... $1,700 00
Five shares Teutonia Bank stock... 500 00
Cash ............................ 1,600 00
Emile Munchow gave his personal note for ...................... 1,150 00
                                        ————
    Total amount paid Ernest Munchow ...................... $4,950 00

The defendant thereafter conducted the business of roofing houses and repairing slate roofs, and the business prospered for about five years. Then he began drinking intoxicants to excess, dissipating and wasting his time and money, and neglecting his business. He bought a gas boat and built another for his individual pleasure, and frequently went out on fishing expeditions for several days at a time, taking his employés, whose time he was paying for, taking also other guests, and paying for quantities of intoxicating liquors and all other expenses of the trips. The office and only business establishment was in the same premises with the residence, and the wife answered the telephone calls, took orders for work, and tried to keep the business from total loss. But the husband continued spending much of his time on fishing expeditions and the balance principally in a maudlin condition at home. At the end of four or five years, the defendant had very little regard for his responsibilities to his wife and their four little children; and his conduct had become so offensive to her that she and the children left the matrimonial domicile, took up their residence with her mother, and she then filed this suit against her husband for a separation from bed and board. He filed simply a general denial, asserted no claim against the community, admitted that his wife had been always faithful and dutiful, and offered no evidence whatever to rebut the abundant proof of his habitual drunkenness, cruelty, and ill treatment of his wife.

On the trial of the oppositions to the proposed partition of the community funds, the defendant made a feeble attempt to prove by the testimony of his father that the plaintiff had conducted her household on an expensive basis, entertaining company, and having perhaps unnecessary servants.

The purpose was, as appears from the argument and reasons for judgment, to show that what the husband had when he married the plaintiff was not afterwards squandered

by him in his individual enjoyment and dissipation, but inured to the benefit of the community. The proof is that the servants' hire, including that of the laundress, for the family of six, amounted to only $24 a month; and there is no evidence of extravagance on the part of the plaintiff, in any other respect.

According to the inventory taken at the dissolution of the community, all that remained of the assets of the business (for one half of which the defendant claims $2,534.71, and for the other half of which the community paid $4,950) consisted of office furniture and fixtures valued at $25.90, old buggy, wagon, mule, harness, ladders, and tools, all valued at $183.50, stock of roofing material, consisting of slates, tiling, and tin, valued at $68, and sundry notes and accounts appraised at $1,000, which were retained by the husband, and which he claims are not all collectible. One of the gas boats was lost or sunk, and all that appears upon the inventory to represent the other is a gas engine valued at $5 and a skiff valued at $5.

During the years of prosperity, the community acquired real estate and personal property, from the sale of which, in these proceedings, there was realized a fund of $10,238.15, which, added to certain items retained by and charged to the spouses respectively, made up a total of $11,590.59. From this, the notary subtracted costs and charges amounting to $2,976.53, leaving $4,407.03 to be paid to each spouse, less the charges for the property purchased by them, respectively, at the auction sale. As the plaintiff is charged with $1,500 for property purchased by her at the auction sale, there will be very little, if anything, left for her if the defendant's judgment for $5,500 against the community be paid.

There is no proof that the separate funds of the husband were invested in any of the property belonging to the community at the time of its dissolution, except the inference that the community could not have accumulated $11,590.59 in the 15 years of its existence, without the aid of what the husband had at the time of the marriage.

The judgment of the district court is said to be founded upon the decisions of this court in Succession of Kidd, 51 La. Ann. 1169, 26 South. 74, and Succession of Kleinert, 125 La. 549, 51 South. 584; and the appellee's counsel also refer us to Succession of Cormier, 52 La. Ann. 881, 27 South. 293.

Succession of Kidd does not lay down a rule with regard to the proof necessary to sustain a claim asserted by one of the spouses against the community. On the contrary, it was said:

"No fixed rule or standard as to extent of the evidence necessary to sustain such a claim can be formulated. We have to take into consideration all the surroundings and circumstances connected with each case to ascertain whether it can be reasonably said that the situation of the community at the time of the husband's death (or at the dissolution of the community) could or would have been found as it was, in the absence of having called in to its assistance and for its benefit outside funds and property."

The judgment recognizing the separate estate of Kidd to be a creditor of the second community was based upon a situation of affairs very different from the facts of this case. The firm in which Kidd had an interest conducted a mercantile business, owning a stock of merchandise, until the second community was dissolved by his death. It was observed by the court that he had been "a prudent, conservative business man," and that he had not "met with any business losses or reverses." The conclusion was that, at the dissolution of the second community, it still possessed the full value and benefit of the business and property which had been contributed to it by the husband's separate estate. And it was observed that the effect of recognizing the right of the heirs of the husband to withdraw the amount of his separate funds, reasonably ascertained to have been utilized for the benefit of the second

community, would not leave it in a condition of insolvency, but with a surplus of profits; and that the second community would still come out with a large amount belonging to it. With apparent doubt as to the sufficiency of the proof and legality of the claim, it was said to be equitable to allow the claim of the separate estate of the husband against the second community under the circumstances.

In Succession of Kleinert, the heirs of the first marriage of the husband were recognized as creditors of the second community for half of the value of a furniture business, the assets of which consisted of a stock of merchandise valued at $2,250 and $625 in cash. The court remarked:

"Nothing shows what became of the $625 cash and of the $2,522 stock of merchandise, or of the proceeds of the sale of the latter. But it is not shown, or even suggested, that the same was wasted, or misapplied, or lost, or was in any way, shape, or form applied to any separate use of Kleinert."

In Succession of Cormier, the contest was between the children of his first marriage and those of his second marriage; both of his wives being dead. He had had an inventory of the property of the first community made and recorded soon after the death of his first wife, but failed to qualify as natural tutor of his minor children before his second marriage. Therefore there was no dispute or doubt about his owing to his children by his first wife the value of their half of the property of the first community, which he had retained and contributed to the second community. The only question at issue was whether he or the second community should pay the debt due to the children of the first marriage. The inventory of the property of the first community amounted to only $961.63, and the proceeds of the sale of the property of the second community amounted to $33,236. The surviving husband testified that the property of the first community inured to the benefit of the second community, and the court concluded that the second community ought to pay for the children's property which it had retained and had the benefit of.

We adhere to the view that there is no fixed rule or standard of proof required to establish that the contribution of the separate funds of the husband has inured to the benefit of the community. But we are constrained to hold that, to sustain such a claim, it must be shown with reasonable certainty that the community still had the benefit of the contribution at the time of its dissolution, and that the separate fund was not wasted by the husband or disposed of for his separate benefit or personal enjoyment.

It does not appear that the firm of E. Munchow & Son owned a stock of merchandise of any considerable value, as in the two cases cited above. The principal value of the business was in the good will and patronage established by the technical knowledge and skill of the members of the firm and their devotion to their business.

Though it may be assumed that this community would not have been as well off as it was at the date of its dissolution if the husband had not owned a half interest in the slating business of E. Munchow & Son at the date of his marriage, it is impossible to say how much better off the community was at the end than it would have been if Mr. Munchow had not been so well off at its beginning. The half interest in the business, owned by the husband at the date of the marriage, is shown to have been worth only about half as much as the community paid for the other half interest five years after the marriage; and there was practically nothing left of it at the dissolution of the community. Under such circumstances, it is impossible to balance accounts mathematically between the husband and the community which existed between him and his wife. To attempt to

estimate their financial differences would amount to nothing more than a guess.

The theory advanced in support of this claim seems to be that, at the dissolution of the community, the parties must be restored to the financial situation in which they stood, relatively, when they contracted marriage, and that, from the fact or circumstance that the husband had or received certain funds of his own, it must be inferred that the community got the benefit of it, and that he continues to be a creditor of the community until its dissolution and final settlement. But that doctrine is not borne out by the three decisions cited in support of it, and it is not the law. There has been no departure from the doctrine announced in Babin v. Nolan, 6 Rob. 508, viz.:

"Proof that a husband received a certain sum during the existence of the community, in payment of a debt due to him individually, is not sufficient to charge the community with the amount, when there is no evidence that the community was benefited by it, or that it was used in the purchase of community property."

From the syllabus of the decision in Stewart v. Pickard et al., 10 Rob. 18, we quote:

"The price of a slave who belonged to the husband before the marriage, but was sold by him during its existence, cannot be charged to the community, without proof that the price was employed for its benefit."

In Belair, Tutor, v. Dominguez, 26 La. Ann. 606, it was said:

"The court below did not err, as contended by the opponents to the tableau of the administratrix, in not charging the community existing between the deceased and his surviving widow with a certain sum of money received by the deceased during marriage from the sale of his separate property, because it is not proved that this money was expended by the deceased for the benefit of said community."

From Succession of Bollinger, 30 La. Ann. 193, we quote the syllabus, viz.:

"The community formed by a man's second marriage cannot be held liable for the value of property belonging to a former community, sold by him during his second marriage, unless it be proved that the proceeds of such property were expended for the benefit of the second community."

The cases quoted above were all referred to approvingly in Succession of Foreman, 38 La. Ann. 700, where it was held:

"When separate funds or property of the husband have been used to benefit and enrich the community, it will constitute a debt of the community in favor of the husband to the amount of such fund or the value of such property. But the evidence must establish, with reasonable certainty, that the funds were thus used or the property thus employed."

And again, in Succession of Breaux, 38 La. Ann. 728, it was said:

"In order to charge the community for separate account of the husband, the proof must show, with reasonable certainty, that his property or money has been used for the benefit of the community."

The case of Heirs of Gee v. Thompson & Burns, 41 La. Ann. 354, 6 South. 550, presented the very issue which we are now dealing with. It was held "that the solution of these claims must be made on the status of the community at its dissolution," and that amounts spent by the husband for pleasure trips with his wife were not legal charges against the community. From the syllabus we quote these appropriate expressions:

"To entitle the husband to claim as a creditor of the community, the law demands substantial proof that the amounts were actually invested by him in the community.

"It is not sufficient to prove that during the marriage the husband received large amounts of separate funds, if it appears that he spent a portion for his own pleasure and convenience and those of his wife; that he lost another portion by unfortunate loans, or by investment in securities which he afterwards disposed of."

Although the decision in each case has been and must be controlled by its peculiar facts, and no fixed rule has been or can be laid down as to the sufficiency of evidence to support such a claim, our jurisprudence is consistent in this: That the community does not owe the husband for his separate funds contributed to it, except to the extent that the community is thereby enhanced at its dissolution, and this must be shown with reasonable certainty.

From the evidence in this case, we can as well infer that the separate funds of the husband were wasted by him for his individual enjoyment as conclude that the value of the community property is now augmented by his separate funds. Our conclusion is that his claim should not be allowed.

Taking up the item of $1,000 with which the notary charged the defendant for the open accounts and bills receivable retained by him, we conclude that the district judge was correct in reducing the charge to the amount actually collected, leaving the uncollected bills to be apportioned between the parties.

As to the appellant's complaint of the reduction of the auctioneer's charge to the amount which he paid the publisher for the advertising, the appellant has not paid nor made herself personally responsible for this debt; hence she has no interest in increasing the charge against the community.

The notary public gave credit to the plaintiff's attorney for $1,100 as his fee, and charged him with $800 which had been paid to him by the auctioneer on an order from the plaintiff. The district judge reduced the charge against the community from $1,100 to $500, which, in our opinion, is fair compensation. The community is not responsible for what the plaintiff may have agreed to pay her attorney, but only for the value of the services. The defendant's attorneys were allowed $400; and that is all they demanded.

The appellant has no interest in complaining of the rejection of the claim of the law firm of Ansley, Graham & Ansley, as the balance of a fee for representing the defendant. Nor has she any interest in complaining of the reduction of the notary's fees for the inventory, etc.

The fee of $400 allowed the attorneys representing the defendant is not excessive. It was properly charged to the community; and

the defendant is entitled to the credit of $200, which he paid to the attorneys, because he is charged with the community funds retained by him.

For the reasons assigned, the judgment appealed from is amended by striking out the item of $5,500, for which the defendant was given credit for separate funds alleged to have been contributed by him to the community; in all other respects the judgment is affirmed; and the case is remanded to the civil district court for execution of the judgment as amended. The cost of this appeal is to be borne by the community.