375 So.2d 660 (1978)
Herrick J. LANE
v.
Katherine Ernst LANE.
No. 9007.
Court of Appeal of Louisiana, Fourth Circuit.
October 31, 1978.
Rehearings Denied October 18, 1979.
*664 Hammett, Leake, Hammett, Hulse & Nelson, Robert E. Leake, Jr., New Orleans, for plaintiff-appellant-appellee Herrick J. Lane.
Baldwin & Haspel, Robert R. Rainold, Joel A. Mendler, New Orleans, for defendant-appellee-appellant Katherine Ernst Lane.
Before REDMANN, GARSAUD and DeSONIER, JJ.
GARSAUD, Judge.
This appeal is from a judgment decreeing a settlement of marital community of acquets and gains existing between Herrick J. Lane, Jr., and Katherine Ernst Lane. The parties separated on November 13, 1966, and were divorced by judgment of April 28, 1969 upon a petition filed November 14, 1968. The instant suit was filed by Mr. Lane on May 22, 1970 to settle the community. After lengthy proceedings before a Commissioner, begun on October 5, 1975, a judgment based on the Commissioner's findings was rendered and signed on May 24, 1977.
The judgment of the trial court made various determinations regarding the separate or community nature of the parties' assets, the nature of various debts, and the amounts of reimbursement due between the parties. The conclusions of the Commissioner adopted by the trial court were not satisfactory to either party, and both of them have appealed from the trial court's judgment.
The issues presented by this appeal, in broad general categories, are as follows:
(1) Were the proper procedures followed with regard to referral of the case to the Commissioner, his handling of it, and the trial judge's adoption of the Commissioner's report?
(2) Were the various stocks in question properly designated separate or community (or, in some instances, partly-owned by each spouse although not technically community)?
(3) What is the result of the husband's transactions after dissolution of the community involving stock which was formerly community?
(4) Was there a valid sale of 50 shares of Lane & Co. stock to Minna Lane, sister of Mr. Lane?
(5) Were the various debts in question properly classified as separate or community?
(6) How much reimbursement is due from the community to the separate estates of the parties and vice versa?
(7) What is owed between the parties as a result of income received after dissolution of the community?
(8) Is the community liable for attorney's fees, expert witness fees, and costs incurred by Mrs. Lane in prosecution of the case at trial and on appeal?
With regard to the procedures followed by the Commissioner and the trial court, no error is found. Mr. Lane protests that the Commissioner was not empowered to file a Supplemental Report, as was done to correct apparent omissions. This occurred after counsel for Mrs. Lane, by letter to the Commissioner, pointed out these omissions. Mr. Lane's argument apparently is that the proper remedy to correct these oversights was through the filing of exceptions to the Report of the Commissioner, to be ruled upon by the trial judge. Inasmuch as the amendments were made by the Commissioner purely to correct his obvious errors of omission, this argument is not well-founded. This was a common-sense solution not proscribed by the appropriate statute.
Next, counsel for Mr. Lane objects to the handling of the hearing of the exceptions to the Commissioner's Report by the trial judge, contending that no review of *665 the record was made, that the exceptions were summarily dismissed, and that the Report of the Commissioner was accepted pro forma, all in violation of R.S. 13:1171. On the contrary, there is absolutely no evidence to support this contention that R.S. 13:1171 was not fully complied with. The parties were given every chance to be heard, and there is simply no indication that the trial judge failed to review the record properly.
Moving now to the substantive questions raised, we must decide whether the classification of various stocks as community or separate was correct. In reaching our conclusions in this regard, we have sustained some of the Commissioner's rulings and have changed others.
First, it is necessary to dispose of the "wedding gift" theory put forth by counsel for Mrs. Lane, which contention would result in all stocks' being community. The Commissioner made certain findings of fact on this point which will be sustained in the absence of manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973). Not only is there no manifest error, but the evidence allows no other conclusion than that reached by the Commissioner:
"In January of 1950, which was prior to his marriage to defendant, plaintiff borrowed from his father the sum of $8,000.00 and acquired certificate No. 13 for 400 shares of the common stock of W. Horace Williams Co., Inc. One month thereafter, on February 3, 1950, the father had him execute a note evidencing this $8,000 indebtedness.
"On June 17, 1950, plaintiff and defendant were married.
"On June 19, 1950, while plaintiff and defendant were on their honeymoon, plaintiff's father and mother made a gift to his sister, Minna W. Lane, of $8,000.00.
"On June 26, 1950, after plaintiff returned from his honeymoon, his father, to equalize the gift made to the daughter, cancelled and marked as paid the $8,000.00 note. A 1950 gift tax return was filed by the parents, showing a donation of $8,000.00 to each child.
"It cannot be disputed but that at the time of the marriage plaintiff owned 400 shares of W. Horace Williams stock and was indebted to his father for $8,000.00.
"Your Commissioner finds no merit to the contention of the defendant, wife, which would convert the stock, brought into the marriage by plaintiff, from a status of separate property to that of community property simply because a debt owed by plaintiff before his marriage was forgiven by his father after the marriage. The forgiveness of the debt, which amounted to a gift of $8,000.00 to the son by the father could in no way affect the status of the W. Horace Williams stock by converting it into an asset of the community. Your Commissioner is of the opinion that the forgiveness of the debt by the father amounted to a gift made to his son alone . . . ." (Emphasis added.) Report of the Commissioner, pp. 3-4.
As the Commissioner points out, even if the forgiveness of the debt could be construed to have been a wedding present to the couple, this would not affect the status of the stock itself, but rather would only entitle the community to reimbursement for that amount. The weight of the evidence, however, is wholly against such a conclusion. Consequently, the 400 shares of W. Horace Williams Company were the separate property of Mr. Lane. C.C. Art. 2334. All stocks subsequently acquired by Mr. Lane from these shares or from the proceeds of their sale, without commingling of community funds, retain that separate status.
In 1956 a merger between W. Horace Williams Company and McWilliams Dredging Company took place, to form Williams-McWilliams Dredging Company. At that time Mr. Lane's 400 shares of W. Horace Williams were exchanged for 6,000 shares of Williams-McWilliams. These new shares remained in the separate estate of Mr. Lane because there was nothing more than a transformation of the stock. Where separate property is exchanged for other property, the property so received retains *666 its separate character. Kittredge v. Grau, 158 La. 154, 103 So. 723 (1925); Succession of Miangolarra, 297 So.2d 784 (La.App. 4th Cir. 1974). Likewise the 424 shares of Williams-McWilliams received in stock dividends were Mr. Lane's separate property. Daigre v. Daigre, 228 La. 682, 83 So.2d 900 (1955).
In March 1957, the investment firm of Waters-Parkerson was engaged to sell 4,000 shares of Williams-McWilliams and to reinvest the proceeds in a wide variety of other stocks. The proceeds ($100,713.20) were held by Waters-Parkerson until the purchases, totaling $71,134.35, were completed in the first part of April 1957. The difference of $29,583.85 was returned to Mr. Lane by check. The classification of stocks stemming from this original purchase of $71,134.35 is the major issue to be resolved. As noted below, some are the separate property of Mr. Lane and some are community and some are co-owned.
In general, those stocks that can be clearly and specifically traced to Mr. Lane's original separate property are classified as separate. This classification is established in those situations where either the original shares remain which were purchased with the proceeds of the sale of the 4,000 shares of Williams-McWilliams or where present shares were purchased exclusively with the funds received from the sale of stocks which were bought with the proceeds of the sale of the 4,000 Williams-McWilliams shares, and so on. C.C. Art. 2334.
Some of those stocks classified as community are shares which were purchased with funds from a community checking account, which account included proceeds from the sale of certain stocks originally purchased with funds generated by the sale of the 4,000 Williams-McWilliams shares. In this instance, there has been a sufficient commingling of funds to render certain shares community. In short, Mr. Lane sold shares which were his separate property, then deposited the proceeds into a community checking account, commingling with other community cash, then purchased new shares with checks drawn on this account. When this pattern was followed, we have determined such shares to be community. Succession of Hyde, 281 So.2d 136 (La.App. 3rd Cir. 1973), aff'd on other grounds, 292 So.2d 693 (La.1974). Thus, in our conclusion, what is important is the identity of each share and the source of funds used to purchase it as opposed to considering the "portfolio" in globo; i. e., we do not agree that if some shares in the "portfolio" are community, then all are. Further, in some instances, where subscription rights on separate stock were exercised by purchasing the resulting shares with community funds, then all shares were sold, the proceeds of such sales commingled separate and community funds and therefore were considered community. Thus, shares purchased with those proceeds were designated community. For example, if 100 shares of Stock X were separate property and additional shares of Stock X were purchased with community funds through the exercise of subscription rights to make a total of 140 shares, and then the 140 shares of Stock X are sold, any stocks purchased with the proceeds of that sale would be community.
The separate-community division is complicated by the fact that, after the dissolution of the community, the husband in several instances sold stock which formerly belonged to the community and with the sale proceeds bought other stock.
After community dissolution, stock which was community property becomes owned in indivision by the former spouses-in-community and the husband no longer has the authority to dispose of that stock as "head and master" of the community under C.C. Art. 2404. Accordingly, the husband's dispositions of the wife's undivided interest were unauthorized (although effective as to third persons, R.S. 12:601, because the stock was registered in his name). Therefore, unless by some other act the wife authorized the husband's transactions, she had the right to repudiate (as between herself and the husband only) those unauthorized post-dissolution transactions and to demand (within a reasonable time of learning *667 of the husband's acts) the present costs of reacquiring her interests in the stock unauthorizedly sold. Rembert v. Fenner & Beane, 188 La. 385, 177 So. 247 (1937). At the other extreme, the wife might instead elect to ratify completely[1] the unauthorized acts of one acting as her agent, C.C. Art. 3010, and that, we conclude is what this wife did by demanding half of all stocks acquired after the dissolution.
We therefore treat as owned in indivision stocks acquired with funds arising from the sale of stocks in which the wife had an undivided interest. Because of the wife's demand for half of all new stocks, we assign to her the largest interest in the new stocks, not exceeding half, that her share of the proceeds of the old stock could pay for, on the theory that her demand includes the exercise of her right to so treat the husband's unauthorized purchase out of a fund belonging partially to herself. Where that post-dissolution "commingled" fund purchased stock in more than one corporation, we pro-rated the wife's interest over all shares purchased. Thus, in most cases, we treat the wife's share of the proceeds as 100% invested, with the consequence that we assign to the husband any cash excess of sale price over purchase price. When, however, the wife's interest was half in the old stocks and their proceeds were not fully spent on the new stock, we give each spouse half of the new stocks plus half of the excess proceeds on the theory that the wife's demand for only half accepts such a result.

STOCKS CLASSIFIED AS SEPARATE PROPERTY OF MR. LANE
Stocks which remain and were purchased with proceeds from the sale of the Williams-McWilliams shares and for which purchases no community funds were used are 520 shares of Mid-South Utilities and 400 shares of Westinghouse Electric. The Mid-South Utilities has increased from the original purchase of 130 shares by a 2-for-1 split in 1960 and a 2-for-1 split in 1966. The Westinghouse Electric has increased from the original purchase of 100 shares by a 2-for-1 split in 1960 and a 2-for-1 split in 1971.
Also belonging to Mr. Lane's separate estate are shares traceable to the Williams-McWilliams shares but "one or more transactions removed" from them. These stocks are as follows:
(a) One hundred thirty-five shares of Square D, purchased in 1969 for $2,965.49 with the proceeds ($3,776.13) of the sale of 70 shares of Union Carbide. The 70 shares of Union Carbide were the separate property of Mr. Lane because 45 shares were originally purchased in 1957 from the proceeds of the first Williams-McWilliams sell-off, 10 shares were sold in 1959, and a 2-for-1 split of the remaining 35 shares occurred in 1965. No community funds were shown to be involved in this purchase.
(b) Two hundred thirty-four shares of General Tire and Rubber also belong to Mr. Lane's separate estate. Two hundred shares were purchased in 1967 and the total has increased by 34 shares acquired through various stock dividends since 1967. Some of these stock dividends required additional cash to purchase fractional shares, but all of these cash payments were made subsequent to the dissolution of the community, and therefor do not create a problem of commingling. The purchase price of $6,143.63 for the original 200 shares resulted from the sale of 200 shares of Central & Southwest. The Central & Southwest stock was the separate property of Mr. Lane because it was originally purchased in 1957 with the Williams-McWilliams proceeds.[2]
(c) The 212 shares of Coca Cola belong to Mr. Lane's separate estate because they were part of his inheritance from his aunt, Sallie Laney, in 1969. C.C. Art. 2334.
*668 (d) Two hundred fifty shares of Carter Wallace belong to the separate estate because they were bought with the proceeds of the sale of two other stocks, both separate. Thirty shares of Warner Lambert were clearly separate. The 100 share certificate of Consolidated Natural Gas sold to purchase the Carter Wallace could only have been representative of separate shares because the community had only its original 10 share certificate and either another 10 share certificate generated by a stock split or an interest of 10 shares in a 110 share certificate.

STOCKS CLASSIFIED AS COMMUNITY OR CO-OWNED
Some of the remaining stocks in the portfolio managed by Waters-Parkerson belong to the community which existed between H. J. Lane and his ex-wife, Katherine E. Lane. Although the majority of these stocks originated from Mr. Lane's separate estate, they became the property of the community over the years as a result of extensive commingling of funds. As a result of this commingling, reimbursement is owed by the community to the separate estate of Mr. Lane. Succession of Hemenway, 228 La. 572, 83 So.2d 377 (1955); Bruyninckx v. Woodward, 217 La. 736, 47 So.2d 478 (1950); Broyles v. Broyles, 215 So.2d 526 (La.App. 1st Cir. 1968). Others were not technically community, but are part-owned by each spouse, because purchased by the husband after the community's dissolution with the proceeds of formerly community stocks (i. e., stocks owned in indivision after dissolution of the community), with the wife ratifying the husband's otherwise unauthorized sale and purchase by demanding participation in those post-community purchases. These stocks were as follows:

CO-OWNED
(a) 115 shares of Freeport Sulphur;
(b) 94 shares of Texaco;
(c) 200 shares of ITT.
(a) The 115 shares of Freeport Sulphur purchased in May 1970 belong half to each spouse because, although purchased after the dissolution of the community, they were purchased by the husband with the proceeds from the sale of another stock belonging to the community, 86 shares of Phillips Petroleum, and the wife has ratified this sale and purchase as above noted. The difference between the (ratified) sale price of the Phillips and the purchase price of the Freeport Sulphur was $198.93, which belongs half to Mrs. Lane and can in effect be accounted for as a debt to the community by Mr. Lane. C.C. Art. 2408. The 86 shares of Phillips Petroleum were community because 43 shares[3] were originally purchased with community funds acquired from the sale of 100 shares of Socony Mobil Oil which were 55% community and 45% separate property of Mr. Lane.[4] Since the proceeds from the sale of the Socony Mobil stock were commingled into Phillips stock, all of Phillips became community, but $1,740.58, or 45% of the proceeds of the Socony sale ($3,867.95), is due in reimbursement from the community to Mr. Lane for his enhancement of the community to that extent.
(b) In addition to 110 shares of Texaco, which have been determined to belong to the community (see (a) under Community below), 94 shares of Texaco were purchased in 1975 (after the dissolution of the community) to reach the total of 204 presently in the account. These 94 shares include a small interest belonging to the wife because the purchase price was received from the sale of shares of Virginia Electric and RCA, in which the wife had an interest.
The first Virginia Electric acquisition was of 100 shares in April 1957 for Mr. Lane's separate estate, from Williams-McWilliams proceeds. A two-for-one split increased separate holdings to 200 shares (in the form of two 100-share certificates) and the exercise *669 of subscription rights with $330 of the community funds gave the community ten shares. A 1961 gift of 30 shares to Mrs. Lane's son was effected by delivering a 100-share certificate (separate property) to the broker, who caused its division into certificates for 30 and 70 shares. The gift was thus of separate property and reduced the separate shares to 170, represented by one certificate for 100 shares and one for 70 shares, which, plus the community's ten shares, made the total 180 shares (all in the husband's name). A three-for-two split and then a four-for-three split produced two more certificates for 90 shares each. Because those splits represent only a change in form of the previously held shares, Daigre, supra, we deem 85 of each 90 shares from the splits attributable to the husband's separate estate and five to the community. Then in 1972, after the dissolution of the community rendering commingling inappropriate, Mr. Lane delivered 160 shares to the broker (to sell 140), and those 160 shares consisted of the separate property certificate for 70 shares (left from the gift of 30 shares out of a 100-share certificate) and the second of the 90-share certificates from the splits, of which 85 were separate. Thus 155 of the 160 shares delivered were separate. However, the 140 sold are not identifiable as including or excluding the five community shares. But the net result of the sale was $2,431.02 cash plus another certificate for 20 shares. The wife thus could have had the option either to ratify or to repudiate the husband's unauthorized sale of her undivided interest in the 140 sold of the 160 delivered (140 X 2.5/160) and the use of the sale proceeds to purchase other stock. We have deemed her choice to be full ratification. Her interest in that 140 shares was 2.1875 shares and her share of the proceeds of the 140 shares was 2.1875/140 X $2,431.02 or $37.98.[5] (She retained 2.5/160 ownership of the 20-share certificate returned after sale of 140 of the 160 delivered.) The shares of Virginia Electric thereafter numbered 220, represented by a certificate for 100 separate, ten community, 90 mixed (85 separate, five community) and 20 mixed shares. Thereafter, the husband sold in 1972 120 shares of Virginia Electric for $2,137.53 (using those proceeds towards 47 shares of GM) and in 1975 the last 100 shares for $1,157.04 (using those proceeds towards another 100 ITT, 52 [30 & 22] Middle-South and 94 Texaco). There is, however, no evidence to establish whether the 100-share lot delivered for sale in 1972 was the husband's separate 100-share certificate, or the 90 mixed (85 separate and five community) plus ten community, and in any event the 120 shares delivered together for sale had to include at least the 20 mixed shares left from the sale of 140 out of certificates for 160 (in which the wife's interest was 2.5/160 or .3125 shares). Thus unable to decide the correct proportions, we treat each sale as if including a proportionate part of the wife's total interest of 7.8125 shares (half of the 15 community plus her own .3125). The wife is therefore assigned 7.8125/220 of the 120-lot proceeds of $2,137.53, or $75.91 (used towards 47 GM for $3,166.82, of which $75.91 bought 1.1266 shares) and 7.8125/220 of the 100-lot proceeds of $1,157.04, or $41.09 (usedwith RCA and Warner-Lambert proceedstowards a total purchase for $5,634.32 of the second 100 ITT for $2,473.13, 52 Mid-South for $752.42, and 94 Texaco for $2,406.77: we assign to the wife's $41.09 from Virginia Electric 41.09/5,634.32 of the three stocks purchased, *670 i. e., .7293 ITT, .3792 Mid-South and .6855 Texaco).
In addition to that .6855 Texaco, the wife has another 2.4123 Texaco arising from the circumstance that, although the community owned none of the Warner-Lambert, it did own 16.6947 of the 109 RCA sold to buy the ITT, Mid-South and Texaco in question. (The husband first acquired 100 and then 50 RCA from Williams-McWilliams proceeds, then sold 30 of the 50. There followed a dividend of two with a purchase of one (or of a fraction to complete the share), giving the community its first share; then three more instances of dividend of two plus-purchase of one; then the sale of the husband's 100-share certificate; then a split producing 64; a dividend of nine plus a purchase of one; and a dividend of two plus a purchase of one. Assigning to the community its fractional interest in each dividend and the split, and full ownership of each purchased share (despite the unproved probability that purchased shares included a fraction due as dividend), we calculate the separate estate's interest as transformed at 93.3953 shares and the community's at 16.6947 shares.) After the dissolution the wife's half of those shares accounts for 8.3474/109 of the $1,887.51 proceeds of the 109 RCA, or $144.59. That amount paid for 144.59/5,634.32 of the total stock purchase of $5,634.32, and entitles the wife to 2.5662 ITT, 1.3344 Mid-South and 2.4123 Texaco.
Thus the wife's total interest is 3.0978 of the 94 Texaco (in addition to her interest in the community's 110 shares).
(c) In 1972 after the dissolution of the community, 100 shares of ITT were purchased, and these belong to the spouses in unequal indivision. The wife's interest amounts to 16.8276 shares, as explained at n. 5 above [p. 669].
In 1975, a second 100 shares were purchased as discussed in (b) above from the proceeds of the sale of Virginia Electric, RCA, and Warner Lambert. This interest amounts to 3.2955 shares (2.5662 + .7293).

COMMUNITY
(a) 110 shares of Texaco;
(b) 202 shares of Babcock-Wilcox;
(c) 400 shares of Standard Oil of Indiana;
(d) 50 shares of United Airlines;
(e) 100 shares of R. J. Reynolds, 100 shares of Zenith, and 130 shares of TRW;
(f) 100 shares of Gillette.
(a) Purchased in 1959 with some of the proceeds from the Socony Mobil sale were 25 shares of Texaco. Consequently, all the Texaco shares (110) springing from that transaction must be classified as community.[6]
(b) The 202 shares of Babcock-Wilcox are the result of commingling of separate and community funds and are a community asset. One hundred thirty shares were originally purchased from the sale of Williams-McWilliams, and 13 more shares were acquired through subscriptions using community funds of $455.25. Then all 143 shares were sold in October 1957 (for $4,231.94), along with 100 shares of Standard Oil of Indiana and 55 shares of Alcoa for a tax loss. This sale of the above three stocks brought $11,509.04, which was retained in the brokerage account but which amount and any shares purchased therewith were community because of commingling including the community's proceeds from its 13 shares of Babcock-Wilcox. (Mr. Lane is entitled to credit, however, for 130/143 of the $4,231.94 proceeds of the Babcock-Wilcox sale or $3,847.22.) A few weeks later several purchases were made with these proceeds plus $633.84 additional cash from the community, rendering all of the stocks thus acquired community property. The shares so purchased were 100 shares of Babcock-Wilcox, 100 shares of Standard Oil of Indiana, 55 shares of Alcoa, four shares of Standard Oil of New Jersey, and 50 shares of General Motors. The 100 newly-acquired shares of Babcock-Wilcox increased to 202 through a stock dividend (one share) in 1958 and a 2-for-1 split in 1964.
*671 (c) The Standard Oil of Indiana stock became commingled in the same way and in the same transaction as did the Babcock-Wilcox. One hundred shares were purchased in 1957 from the proceeds of the Williams-McWilliams stock sale, and these were sold for $3,776.61 along with the 143 shares of Babcock-Wilcox and 55 shares of Alcoa as discussed above. One hundred shares were reacquired with the $12,142.88 of commingled funds in late 1957 and are therefore community. A 2-for-1 split in 1964 and another in 1974 have increased the number of shares held to 400, as shown, in the inventory. Because the proceeds of the sale of the original shares, which were separate property, were commingled with community funds, $3,776.61 should be reimbursed to Mr. Lane.
Similarly, the last Alcoa stock, which is no longer in the portfolio, was community. Fifty-five shares were first bought in 1957 from Williams-McWilliams proceeds. These shares were sold later in 1957 and another 55 purchased, all in the same transactions discussed above in connection with the Babcock-Wilcox stock. For that reason Mr. Lane is entitled to $3,500.49, which amount was received from the 1957 sale before commingling took place.
(d) Fifty shares of United Airlines are community because they were part of an original 125 shares[7] purchased in 1968 with the proceeds from the sale of 100 shares of Addressograph, 55 of which belonged to the community, and 45 of which were Mr. Lane's separate property. The 55 were community shares because they were purchased for $2,946.83 in January 1967 with funds from a community checking account. The funds were the $2,841.95 proceeds of the sale of 79 shares of Allied Chemical plus some additional cash to make up the difference. The other 45 shares of Addressograph, however, were Mr. Lane's separate property, having been purchased solely with his separate funds from the sale of 200 shares of Central & Southwest, his separate property.[8] Consequently, because of the commingling of the proceeds from the sale of Addressograph, resulting in the proceeds becoming community property, Mr. Lane is entitled to reimbursement of 45% of the $7,702.84 proceeds of the Addressograph sale, or $3,466.28.
(e) One hundred thirty shares of TRW,[9] 100 shares of Zenith,[10] and 100 shares of R. J. Reynolds are all classified as community, as they were purchased with checks drawn on the NBC community checking account.[11] (See Tr. Vol. II, pp. 139-143.)
(f) One hundred shares of Gillette are classified as community. Although there is a great deal of confusion regarding the cash used to purchase these shares (see Tr. Vol. III, pp. 52-67), we conclude that the source of the cash was the sale of 55 shares of Alcoa stock (Tr. Vol. III, p. 59). As Alcoa was a community asset due to commingling (see discussion above at (c)), these 100 shares which are traced to that source are also community.

MIXED CLASSIFICATION
(a) With regard to 280 shares of U.S. Rubber (Uniroyal), the record supports the conclusion that 200 shares are Mr. Lane's separate property and 80 shares are community. Fifty shares were purchased originally with part of the proceeds of the sale of 200 shares of Natural Fuel Gas, shares which were the separate property of Mr. Lane as they were purchased with proceeds from the sell-off of Williams-McWilliams. *672 Twenty shares of U.S. Rubber were subsequently purchased with community funds. As all these 120 shares remain (there was no sale and repurchase), there is no difficulty in establishing their nature as separate or community. The present 280 shares is merely a reflection of stock splits (4-to-1 ratio) in these original shares. Mr. Lane has carried the burden of showing that 200 of these shares are his separate property. Succession of Hyde, supra.
(b) Of the 147 shares of GM, we have classified 50 as community, 47 as co-owned, and 50 as separate. An original purchase in 1958 of 50 shares was effected in part by check and in part through the use of the commingled proceeds from the sale of 143 shares of Babcock-Wilcox, 100 shares of Standard Oil of Indiana, and 55 shares of Alcoa (see discussion under Standard Oil of Indiana, at (c) under Community, above). These 50 shares of GM are therefore community.
In 1960, fifty additional shares were purchased with part of the proceeds of the sale of 200 shares of Natural Fuel Gas, a separate asset of Mr. Lane. These latter shares were purchased with proceeds from the sell-off of Williams-McWilliams. Thus, these 50 shares of GM are Mr. Lane's separate property.
In 1973, after the dissolution of the community, forty-seven shares of GM were purchased for $3,166.82 with the proceeds derived from the sale of Virginia Electric and United Airlines shares. At (b) above we have reasoned that 1.1266 of these 47 GM are the wife's because bought with her interest in the Virginia Electric. We now add that the wife's interest in the formerly community United Airlines shares was half of the $1,091.48 proceeds, or $545.74. That paid for 545.74/3,166.82 of the 47 GM, or 5.8028 shares, making the wife's interest 6.9294 shares of the 47.
(c) Finally, we trace the IBM shares thus. The husband bought ten with separate funds, then received ten more in a split, making 20. Frequently thereafter shares were acquired by exercise of shareholders' rights requiring payment of funds and, for lack of contrary evidence on the source of those payments, we apply the presumption of C.C. 2404 in favor of the community. Thus the community first acquired two by subscription. The resulting total of 22 produced 11 more in a two-for-one split, attributable ten to the husband and one to the community, and on the same date the community paid for another subscribed share, making the totals 30 and four. Another subscription share increased the community's shares to five. Then a sale of five shares of the husband's second ten and a gift of two community shares to the wife's son left them with 25 and three (28). Splits increased the shares by half, then by a fourth, and then by a half, with two added shares (or parts of two) being subscribed for by the community (apparently because the splits would have delivered fractional shares). We trace these transactions as increasing the holdings first to 37.5 and 4.5, then to 46.875 and 5.625 with the community exercising the right to complete the fractional share (the five-for-four split produced 10.5 extra shares), bringing its shares to 6.125 and the family total to 53 shares. Then a three-for-two split raised the numbers to 70.3125 and 9.1875, with the community again exercising the right to complete the fraction, increasing its shares to 9.6875 and the total to 80. In June 1966 rights to two shares were exercised with community funds, bringing the community shares to 11.6875. A two share dividend in June 1967 is attributed (for lack of other explanation) proportionately to the holdings, increasing the husband's shares by 1.7149 to 72.0274 and the community's by .2851 to 11.9726 and again to 12.9726 (by subscription for one share) for a total of 85 then doubled by a 1968 split to 170 (144.0548 and 25.9452). Thereafter, after the dissolution of the community, the increase of 43 shares through dividends is attributed proportionately,.84738 or 36.4373 shares to the husband and .15262 or 6.5627 shares to the community, making their final interests in the 213 shares 180.4921 and 32.5079 so that Mrs. Lane's interest, from half of the "community" shares, is 16.2540 shares.

*673 OTHER PORTFOLIO ISSUES
Counsel for Mrs. Lane argue that all stocks acquired during the existence of the community should be community because of Mr. Lane's failure to file a "double declaration" at the time of acquisition to state his intention to have these be his separate property. This is a jurisprudential rule, created to protect the wife from a subsequent statement of intention by the husband after the success of the investment has been determined. See Huie, Separate Ownership of Specific Property Versus Restitution from Community Property in Louisiana, 26 Tul.L.Rev. 427 (1952). Furthermore, even the filing of a "double declaration" does not by itself prove "the separate status and does not of itself overcome the presumption; it merely permits the introduction of evidence if a party seeks to prove the separate nature of property acquired during a community." Succession of Pitman, 282 So.2d 799, 804 (La.App. 1st Cir. 1973). See also, Primeaux v. Libersat, 307 So.2d 740 (La.App. 3rd Cir. 1975), vacated on other grounds, 322 So.2d 147 (La.1975); Locantro v. Falco, 144 So.2d 742 (La.App. 4th Cir. 1962).
However, there is no precedent for the application of the principle to the acquisition of shares of stock. The "double declaration" has only been held to be required in cases involving immovable property. Coney v. Coney, 220 La. 473, 56 So.2d 841 (1951); Phillips v. Nereaux, 357 So.2d 813 (La.App. 1st Cir. 1978). This has been pointed out by various courts on numerous occasions:
"It is well established that a husband purchasing immovable property during the existence of a marriage must make a declaration in the act of conveyance that the property acquired is to be his separate property and the funds used to purchase are his separate funds. In absence of such a declaration the property is presumed to be community property and this presumption is conclusive. Therefore, this immovable property belongs to the community estate. LSA-C.C. arts. 2334, 2402. Smith v. Smith, 230 La. 509, 89 So.2d 55 (1956). Boulet v. Miguez, 221 So.2d 602 (3rd La.App.1969)." (Emphasis added.) Poole v. Poole, 270 So.2d 218, 221 (La.App. 1st Cir. 1972).
"The presumption in favor of the community provided by Article 2405 is rebuttable by the husband (as it is by the wife) in all cases, excepting his purchases of real property during the marriage. Kittredge v. Grau, 158 La. 154, 103 So. 723." (Emphasis added.) Bruyninckx v. Woodward, 217 La. 736, 47 So.2d 478, 481 (1950).
"The general rule is that when a married man acquires real property in his name, without a dual declaration in the deed that he is purchasing the property with his separate funds and intends it to become part of his separate estate, the property so purchased is conclusively presumed to belong to the community. Succession of Sonnier, 208 So.2d 562 (La.App. 3rd Cir. 1968)." (Emphasis added.) Blalock v. Blalock, 259 So.2d 367, 369 (La. App. 2nd Cir. 1972).
The cases on which Mrs. Lane relies to show that the "double declaration" rule is applicable to stock and other movable property make no such holding. That has never been the rule. Counsel for Mrs. Lane argue that Article 2334 of the Civil Code makes no distinction between movable and immovable property. This is true, but it overlooks the fact that Article 2334 does not require the "double declaration." The Code creates the presumption of community, but states that it may be overcome by sufficient proof. It was the courts that placed the burden of double declaration on the husband where real property is concerned.
Mrs. Lane contends in the alternative that if all the stocks are not found to be community property, that at the least the community is entitled to the value of the enhancement of those stocks found to be Mr. Lane's separate property. This argument is based on the theory that the enhancement was the result of community *674 effort and expenditures. C.C. Art. 2408.[12]Palama v. Palama, 323 So.2d 823 (La.App. 4th Cir. 1975), writs refused February 17, 1976.
Mrs. Lane's counsel went to great lengths at trial to show her involvement in the management of the stock portfolio. A copy of Stock Encyclopedia Book of Standard & Poor was introduced into evidence to show that she had studied the stock market and various specific stocks. Her own testimony, however, does not link her activity to any management decisions regarding the portfolio.
It would have been sufficient to show that either of the spouses had been personally responsible for the increase through their experience and knowledge of the stock market. It is well settled that
". . . if either husband or wife substantially contribute to the amelioration of the separate property of one of them during the marriage by his or her labor or industry, the spouse who does not own the separate property is entitled to the reward of one-half the value of the increase and it is immaterial whether the enhancement is attributable to his or her personal effort. The important circumstance is that the contribution must result from community labor, industry or expense." (Emphasis added.) Abraham v. Abraham, 230 La. 78, 87 So.2d 735, 738-739 (1956).
The Commissioner concluded, correctly we believe, that the increase in the value of the stock portfolio was not the result of Mr. or Mrs. Lane's management or community expenditure (fee paid to broker),[13] but rather that it was attributable to the advice and skill of their investment counselor. The Commissioner stated,
"In this case it was shown that the original stocks were delivered to the broker, that the broker sold same, retained the proceeds and bought other stocks, as per instruction given to him by the plaintiff. In order for the defendant to be entitled to the reward of one-half of the value of the increase or ameliorations, it was incumbent upon her to prove that such increases or ameliorations resulted from common labor, community expenses or industry. The law contemplates a situation where the husband exerts some effort in effecting the increased value. The portfolio in the case at bar was actively managed by the broker, not by the plaintiff [Mr. Lane]." Report of the Commissioner, p. 13.
Accordingly, we affirm the Commissioner's decision in this regard.

REIMBURSEMENT TO MR. LANE
With regard to Mr. Lane's entitlement to the various reimbursements from the community, discussed in the individual stock transactions above, the treatment of husbands and wives is different.
"Under our law the wife, unlike the husband, has the absolute right to restitution for her paraphernal effects and their fruits, either delivered to her husband or delivered for use to the community, save in instances governed by Article 2389 of the Civil Code, which is not applicable here. In the case of the husband, it is incumbent upon him to establish that his separate property has been employed to enhance the community at its dissolution. Munchow v. Munchow, 136 La. 753,67 So. 819; Vicknair v. Terracina, 168 La. 417, 122 So. 276; Succession of Provost, 190 La. 30, 181 So. 802; Abunza v. Olivier, 230 La. 445, 88 So.2d 815." Slater v. Culpepper, 233 La. 1071, 99 So.2d 348, 360 (1957).
*675 When separate funds have been commingled with community funds they become community, and when spent it is generally impossible to tell when the separate funds have actually been used to enhance the community. In these cases no reimbursement is due. Abunza v. Olivier, 230 La. 445, 88 So.2d 815 (1956).
However, this was not the case here. The separate funds which were invested in the stock market are easily identifiable. Thus, all that is required of Mr. Lane to entitle him to reimbursement is for him to show that the infusion of separate funds into the community resulted in an enhancement of the community at the time of its dissolution. Succession of Bell, 194 La. 274, 193 So. 645 (1940).
"[T]he husband's separate estate will be deemed a creditor of the community, and thus entitled to reimbursement, to the extent his separate funds were expended in enhancing the community estate. Gouaux v. Gouaux, 211 So.2d 97 (La.App. 1st Cir. 1968). However, no presumption exists that the husband who possesses separate funds prior to marriage has used those funds to benefit the community. Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169 (1956).
"He who seeks reimbursement has the burden of showing that his separate funds were used in the enhancement of the community assets." Vicknair v. Vicknair, 284 So.2d 836, 838 (La.App. 4th Cir. 1973).
Because these separate funds were all invested in the stock market, in the manner noted previously, much of the portfolio now belongs to the community, and as the value of the stocks in the portfolio has increased substantially, there can be little question that these separate funds benefited the community. Thus, Mr. Lane's separate estate is entitled to reimbursement from the community in the specific amounts set out earlier, for a total of $16,331.18.
For the same reasons and law cited above, Mr. Lane is not entitled to reimbursement of some $6,682.51 claimed as having been invested in the construction of the Fairway Drive home. Mr. Lane failed to make an adequate showing that the amount spent in the construction of the home was his separate property, or that, even if it had been, there was any enhancement of the community as a result. Rather, as found by the Commissioner, the evidence showed that separate funds belonging to Mr. Lane, from the sale of various stocks, were deposited into a community checking account. This commingling caused these funds to lose their separate identity, and there is no proof that they were actually spent for the benefit of the community. See Abunza v. Olivier, supra.

REIMBURSEMENT TO MRS. LANE
The burden, however, is not as heavy for the wife under the same circumstances. Slater v. Culpepper supra.
"If the wife contributes her separate funds under her separate administration as part of the purchase price of community property, the community is indebted to the separate estate of the wife to the extent of the funds or value of separate property so expended. Succession of Schnitter, 220 La. 323, 56 So.2d 563 (1951); Succession of Miangolarra, 297 So.2d 784 (La.App. 4th Cir. 1974)." Williams v. Carter, 344 So.2d 113, 114 (La. App. 2nd Cir. 1977).
The same principle was stated in Emerson v. Emerson, 322 So.2d 347 (La.App. 2nd Cir. 1975), in which the court said:
"In order to obtain restitution she need only prove that her separate property, or the proceeds of a sale thereof, were delivered to her husband and were used for his benefit or for the benefit of the community. Slater v. Culpepper, 233 La. 1071, 99 So.2d 348 (La.1957); Broyles v. Broyles, 215 So.2d 526 (La.App. 1st Cir. 1968). She need not prove that the value of the community has been enhanced by the expenditure of her funds. Broyles v. Broyles, supra." 322 So.2d at 349-350.
Mrs. Lane contends that $9,130.00 of her separate funds were used for the benefit of the community, for which she should be *676 reimbursed. The evidence showed that she did have some separate funds which she had inherited from her first husband. Four thousand dollars was clearly used as a down payment on the Nashville Avenue house, and although the way in which the remaining amount was spent was not as clearly proven, according to the above-stated principles, it need not have been shown with as clear and convincing evidence as is required of a husband. Furthermore, Mr. Lane did not contest that this amount of her separate funds had been spent for the community. This, in addition to her evidence, was sufficient for the Commissioner to order reimbursement to her of the entire amount claimed. See Emerson v. Emerson, supra. We will not disturb that conclusion.

REIMBURSEMENT TO THE COMMUNITY
The community should be reimbursed $198.93 in accordance with the conclusions reached above under "Stocks Classified as Community."

SOME MISCELLANEOUS ASSETS
With regard to some remaining assets to be classified as separate or community, we believe that the Commissioner was correct in his determinations, and as none were seriously in doubt or disputed, that portion of his Report will be adopted here:
"The sum of $6,243.62, as of November 14, 1978, in Savings Account H099103 at the NBC is the separate property of Mr. Lane, this account being used exclusively for deposit of gifts from plaintiff's mother. The interest, however, amounting to $124.86, belongs to the community.
"Relative to the cash surrender values of life insurance on plaintiff, $8,370.10 represents the community value thereof, and $1,763.50 represents the value thereto to the separate estate of plaintiff prior to his marriage. Likewise, all additions of cash surrender value after November 14, 1968, belong to the separate estate of the plaintiff.
"The balance in Savings Account CA11230 at NBC, after a distribution was made between the parties amounts to $467.62 and this sum belongs to the community.
"The balance in Checking Account # XXXX-XX-XXX at NBC, as of November 14, 1968, in the amount of $1,817.72 belongs to the community.
* * * * * *
"The property 471 Fairway Drive and the contents thereof, belong to the community.
* * * * * *
"The 100 shares of the common stock of Lane Fabricators, Inc. belongs to the community." Report of the Commissioner, pp. 14-15, 22.

LANE & CO. STOCK
The Commissioner held all of these shares to be community property, as they were obtained during the existence of the community and Mr. Lane failed to establish, as required by law, that he utilized his separate property to purchase 100 of these shares. We thoroughly agree. Not only did Mr. Lane fail to show clearly that his separate assets were used, but he admitted under cross-examination that he had considered all of the shares to be community. (Tr. Vol. III, pp. 98, 99.) At best, his claim in this regard amounts to a mere allegation.

SALE OF LANE SHARES TO MINNA LANE
With regard to the sale of 50 shares of Lane & Co. stock to Mr. Lane's sister, the Commissioner held:
"The sale by plaintiff to his sister just 3 days before he and his wife separated indicates that Mr. Lane himself was under the impression that his wife owned 250 shares and he owned 250 shares. The sale was made to assure himself of control of 275 shares against his wife's ownership of 225 shares. The sister herself admitted that her brother asked her to do it and it was her belief that she was helping him and helping his company. She testified that she considered the purchase as an investment yet she never *677 voted the stock, never received dividends, was not paid a salary and was never consulted about the affairs of the business. All circumstances considered, your Commissioner is of the opinion that the sale of the stock to the sister was fictitious, was done as a convenience to plaintiff and to the injury of defendant. Accordingly, the community should be considered as owner of the 500 shares of Lane & Co." Report of the Commissioner, p. 15.
Mr. Lane argues that the sale is not fictitious because the purpose of the sale was to break the Subchapter S tax election of the company[14] and because Minna Lane paid $5,000 for the shares. Mrs. Lane argues that there is no evidence of any payment (no check, receipt, note, etc.) and that the change of election could have been accomplished by merely having the corporation file a revocation of the election.
"[S]imulation, because of its nature, can usually be proven only by indirect and circumstantial evidence (Summers & Bannin v. Clarke, 32 La.Ann. 670; King v. Atkins, 33 La.Ann. 1057; Succession of Dickson, 37 La.Ann. 795), so that, if one alleging a simulation produces evidence of circumstances which create highly reasonable doubts or suspicions as to the honesty of the transaction, a prima facie case is considered as having been made out, and the burden of proof is shifted to the defendant to show that a valid sale existed. New Orleans Acid & Fertilizer Co. v. O. Guillory & Co., 117 La. 821, 42 So. 329; Leon Godchaux Co. v. DiMaggio, 133 La. 199, 62 So. 631; First National Bank of Ruston v. Jones, 186 La. 269, 172 So. 155; Howard v. Howard, La.App., 96 So.2d 345." Smith v. Smith, 239 La. 688, 119 So.2d 827, 831 (1960).
As the Commissioner noted, there were a number of circumstances which raised doubt about the validity of the sale and Mr. Lane's explanation simply did not overcome the presumption. The absence of any documentary evidence of a sale, other than the self-serving statements of Mr. Lane and Minna Lane that they sold and bought the shares respectively, is a serious flaw in Mr. Lane's position and clearly distinguishes his case from the recent case of Phillips v. Nereaux, supra, upon which he relies in his second supplemental brief. The timing of the "sale" and the total failure of Minna Lane to act as a shareholder further supports the Commissioner's decision.
We believe this is a factual conclusion that should be sustained absent a finding of manifest error on the part of the Commissioner and trial court. Canter v. Koehring Company, supra. On the evidence introduced, we cannot conclude that there was manifest error below. Thus, we affirm this ruling.

DEBTS OWED THE COMMUNITY
All parties agree that the Commissioner was correct in designating amounts owed to the community and interest thereon, by Lane & Co. and Lane Fabricators, Inc., to be community property. Lane & Co. owed $61,163.04 and Lane Fabricators owed $14,450.67. The dispute arises because Mr. Lane contends that he is entitled to certain credits, as he used the interest paid to him under these loans to pay the interest to a bank from which a loan was made initially to acquire the funds to loan in turn to the corporation. The commissioner did not provide for a credit. Mrs. Lane argues that the evidence shows that Mr. Lane received no interest from the companies in the period in question, and thus that he could not have used these funds to repay the bank interest. Obviously, the Commissioner agreed with Mrs. Lane, and as this is a factual question and as no manifest error was shown by Mr. Lane, we must affirm. Canter v. Koehring Company, supra.

DEBTS OF THE COMMUNITY
The first major issue is Mr. Lane's claim of a $30,000 debt owed to him by the *678 community. It is his contention that during the existence of the community, he borrowed $30,000 from a bank, which amount he personally repaid after the dissolution of the community, and thus that he is now a community creditor for that amount. Mrs. Lane argues that although the $30,000 was borrowed during their marriage, the funds were put directly into Lane & Co. She concludes that this loan was obviously for the sole benefit of Lane & Co., and the only reason Mr. Lane made the loan and not Lane & Co. was for a better interest rate. In this regard, the Commissioner's report states:
"He claims an additional sum of $30,000.00 as a community debt but the evidence presented did not substantiate this position. He testified that this was a loan made to him because of a better interest rate but the money was borrowed for Lane and Co. to be used for operation expenses. Consequently, it cannot be considered as a debt of the community." Report of the Commissioner, p. 16.
We disagree with this reasoning. C.C. 2403 declares that "debts contracted during the marriage enter into the partnership or community of gains". It is immaterial that the husband used the loan proceeds to make a loan to a third person (which would result in a debt owed by that third person to the community). That the husband loaned the proceeds is doubly immaterial when, as here, the husband made the loan to a corporation wholly owned by the community and therefore benefitted the community by the loan.
Accordingly, we give the husband credit for having discharged this $30,000 community debt; but we must describe among the community's assets the claim for reimbursement against Lane & Co. (a change in description but not net value of assets, since Lane & Co.'s total value was already included in the community in the form of all its shares).
Mr. Lane has raised an issue regarding a debt of $177,000, for which Lane & Co. is primarily liable and he is contingently liable. He maintains that, as the stock portfolio was originally pledged during the community as security for the original note of $262,000, we should recognize that Mrs. Lane's interest in the portfolio, after partition, is burdened by this outstanding loan.
We again find no escape from C.C. 2403's classifying as community all debts contracted during the marriage. Butler v. Butler, 228 So.2d 339 (La.App. 1st Cir. 1969), reached a contrary conclusion, although we note that there the principal debt was that of a corporation in which the husband's separate estate owned shares and the community did not. In our case the community owned 100% of the shares of the principal debtor. Butler's premises are not ours, and we therefore need not examine the correctness of its conclusion. Moreover, R.S. 12:601 makes effective the pledge made by the person in whose name the stock is registered. (Whether Mrs. Lane can withdraw her securities from the pledge is a question to be pursued with the pledgee, who is not a party to this suit.)

SPECIAL ITEMS
The following questions all stem from actions taken in contravention of the judgment of divorce of April 28, 1969, which read in part as follows:
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant, Herrick J. Lane, Jr., in his individual capacity and in his capacity as the President of Lane & Co., Inc., and as President of Lane Fabricators, Inc. and Lane & Co., Inc. and Lane Fabricators, Inc., be and they are hereby enjoined and prohibited from . . . paying unto said defendant or to any third parties for defendant's benefit any funds which may be due to said defendant by said corporations, except that Lane & Co., Inc. may pay the regular monthly salary of Herrick J. Lane, Jr., as President of Lane & Co., Inc. of $3,210.00 per month." Defendant's Exhibit # 29.
Mrs. Lane contends that in violation of that order, Lane & Co. paid additional compensation *679 to Mr. Lane in the form of an increase in salary as well as payments which allegedly inured to his benefit, i. e., premiums on life insurance policies covering his life and payments into a pension plan for his retirement.
The Commissioner ruled that Mr. Lane pay to Mrs. Lane one-half of the total of life insurance premiums paid by Lane & Co. from 1970 until a final partition is accomplished; one-half of the total amounts paid into the pension plan from 1970 until a final partition is effected; and one-half of the amount in excess of the monthly salary set by the judgment from the year 1970 until final partition of the community occurs.
It should be noted here that all payments were made by Lane & Co. after the dissolution of the community. Thus, principles dealing with life insurance and pension plans instituted during the marriage are inapposite. Cf. Connell v. Connell, 331 So.2d 4 (La.1976).
We read the injunction to prohibit payment of "any funds which may be due to said defendant . . . except . . . the regular monthly salary . . . of $3,210". (One recalls the $30,000 loan Mr. Lane made to Lane & Co., Inc.) Assuming that this wording would prohibit paying "the regular monthly salary" including normal cost-of-living or other increases (which may be doubted), it does not prevent their being owed to Mr. Lane. Compliance with the most literal interpretation of the injunction would require only that normal raises in compensation not be paid. (That the raises were normal and proper in amount not a raid on the corporate treasuryseems evident from their modestness compared to inflation, and from the corporation's remarkable prosperity under Mr. Lane's presidency.)
Defendant did violate that most literal interpretation by forgetting that injunction's wording and paying himself a completely "regular" monthly salary with the normal increases any knowledgeable person would expect. But defendant was owed those increases and his ex-wife is not owed them. She could have cited her ex-husband for contempt at the first increase, which would have brought a clarification of the injunction's intent or perhaps other questioning. But it is her ex-husband who has earned those increases by his work, and she is not entitled to half of them.
Similarly, the pension payments are not due to the wife. A most literal compliance with the injunction does not deny the corporate president entitlement to some pension arrangement (although it might have required awaiting some later day to pay corporate funds to a pension entity for him). Again, there may be a technical violation but there is no debt owed to the wife on that account.
In respect to the premiums on life insurance policies on Mr. Lane's life, it appears from the record that the beneficiary of these policies was Lane & Co. and not a named beneficiary of Mr. Lane. The company owned the policy and simply insured the life of Mr. Lane, a key executive. Thus, there was no benefit accruing to him as contemplated by the divorce decree. Hence, no amount is owed to Mrs. Lane in this regard.

INCOME SINCE DISSOLUTION OF COMMUNITY
As far as any income from the community property since the dissolution of the community is concerned, it is clear that that income should be divided equally between the parties until a final partition takes place. Thus, Mrs. Lane owes to Mr. Lane one-half the proceeds of the sale of the community automobile, or $50.00. Similarly, Mr. Lane is accountable to Mrs. Lane for one-half of all dividends paid on those stocks found to belong to the community, from the time of the dissolution of the community either to the date on which such stock was sold, or to such time as a partition was effected.

ATTORNEY'S FEES
The last issue presented on appeal concerns the liability for, and amount of, attorney's fees and expert witness fees due *680 to Mrs. Lane from the community. The trial court judgment awarded $30,000 in attorney's fees, plus $976.50 expended in court costs, to the attorneys representing Mrs. Lane. In addition, an award of $4,780.00 was made on behalf of Clifton A. Morvant, C.P.A., for services rendered to Mrs. Lane and for expert testimony. All these fees were charged against the community.
The husband argues that, once the judgment of divorce dissolved the marriage, the community no longer existed and therefore it became impossible for either husband or wife thereafter to contract a debt for "the community". But the attorney's fees for this suit, filed in 1970 over a year after the judgment of divorce, were all earned at a time when the community was long terminated. We agree. Furthermore, dissolution of the community made the spouses owners in indivision, governed by the partition provisions of C.C.P. 4601-4614. Although C.C.P. 4613 allows an attorney's fee to plaintiff in an uncontested partition, that provision is not applicable to a contested partition like this; Talbert v. Talbert, 199 La. 882, 7 So.2d 173 (1942); and in any event C.C.P. 4613 expressly prohibits charging any portion of plaintiff's lawyer's fee to any defendant represented by counsel. We therefore conclude, following Talbert and Mosely v. Mosely, 216 So.2d 852 (La.App. 2nd Cir. 1968), that the ex-wife's fee for the partition work is not chargeable in any manner to the ex-husband (in the absence of an agreement between the ex-spouses to charge their attorneys' fees against the co-owned property, as in Uchello v. Uchello, 220 La. 1061, 58 So.2d 385 (1952)).
Similarly, the wife's accountant's work is not a community debt. The court could allow him only an expert witness fee. We therefore reduce the accountant's fee to $500.
The husband concedes that attorneys' fees in the unsuccessful separation action and in the divorce action are community expenses, chargeable against the community assets. But he argues that no evidence of the value of those services are presented to the Commissioner and therefore neither the Commissioner nor we are able to fix those fees. He invites us to remand for that purpose and we do.

DECREE
For the reasons stated, the judgment below is amended to the extent that the following shares of stock are found to belong in indivision to H. J. and Katherine Lane, in equal shares except as noted:
202 shares of Babcock-Wilcox;
400 shares of Standard Oil of Indiana;
200 shares of ITT (Mrs. Lane's interest being only 20.1231 (16.8276 + 3.2955) shares);
80 shares of U. S. Rubber;
97 shares of GM (Mrs. Lane's interest being 31.9294 shares);
213 shares of IBM (Mrs. Lane's interest being 16.2540 shares);
204 shares of Texaco (Mrs. Lane's interest being 58.0978 shares).
In addition, the judgment is amended to hold that the following shares belong to the separate estate of H. J. Lane:
200 shares of U. S. Rubber;
50 shares of GM;
250 shares of Carter-Wallace.
The judgment is further amended to delete the attorney's fees, except for those incident to the separation and divorce, as may be proved on remand. The judgment of the trial court is reversed as to the reimbursement to Mrs. Lane of half of the "excess" payments to Mr. Lane, paid by Lane & Co. Reimbursements are due between the parties as set forth above, and in all other respects the judgment appealed from is affirmed.
AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART, AND AMENDED.
REDMANN, J., concurring in part and dissenting in part.
*681 REDMANN, Judge, concurring in part and dissenting in part.
The majority opinion correctly disposes of all matters save the ex-wife's entitlement to share in the fruits of the ex-husband's separate estate composed of corporate stock. As to that matter, the opinion is correct insofar as it does increase the ex-wife's participation in the disputed assets, but it should give the community credit for the entire increase in value of the ex-husband's stockholdings at least over the $100,719.20 proceeds of the 1957 sales of his Williams-McWilliams stock. Preferably, as in the case of a husband's interest in a partnership, Succession of Guercio, La.App. 4 Cir. 1978, 359 So.2d 996, writ refused La., 362 So.2d 576,[1] the judgment should give the community the increase over the market value of the husband's stock on the day of the marriage (to determine which value a remand for further evidence would be necessary).
The first of these alternatives does no more than recognize that, beginning April 1, 1957, the first day on which he bought stock (with Williams-McWilliams proceeds), and continuously thereafter, the husband, paying fixed fees for investment supervision, became a stock trader rather than a simple stock holder. He bought and sold shares of corporate stock like a merchant who buys and sells his stock in trade (although not as frequently). He no longer left his fortune to the care of the Williams-McWilliams corporate management and the vagaries of inflation and the stock market, but undertook, with community-paid assistance, to labor with his own intelligence, perspicacity and intuition to increase or ameliorate the dollar value of his estate by informed and judicious selling of some stocks and buying of others. His legal position became not unlike that of, e. g., an antique dealer who owned a shop full of antiques before he married and never bought more antiques except with the proceeds of sales of the antiques he already had: would we allow an antique dealer, after 25 years of marriage, to trace every antique in his shop to the proceeds of sales of his premarital antiques, without attributing the profits to the community because of his labors?
The second and preferred of the two alternatives espoused by this concurrence abandons legal fiction and, for purposes only of community property partition, recognizes that corporate employees and assets are the indirect employees and assets of the shareholders. Our hypothetical antique dealer, or any other businessman (say a car dealer), should not be able to defeat the law that fruits of his separate estate belong to the community, by incorporating before marriage. He ought not be allowed to keep part of his business profits out of the community on the theory that only corporate dividends (and his salary) constitute fruits of his separate property (and produce of his labor). Even if the husband quit all personal labor in the incorporated business, hiring a corporate president-manager, he should not be able (as sole or principal stockholder) to keep corporate profits in his separate estate by the device of paying low dividends. The law presently provides that profits of his separate estate fall into the community, C.C. 2402, and legal incorporation, intended to foster group ventures and to limit personal liability by the fiction of corporate personhood, was not intended to defeat one spouse's entitlement to half of the profits of the other's separate property. There should be no difference in community entitlement to fruits of the separate estate of a husband operating his business as a sole proprietorship and one operating his business as a wholly-owned corporation. A prospective spouse is free to reject or to modify the community property system by agreement with the other prospective spouse, C.C. 2325, but not by the unilateral action of having a corporation which "owns" his separate property and either retains its fruits (keeping them separate) or pays them as dividends (making them community) as he pleases.
By a similar reasoning the increment of value of separately-owned shares of publicly-held *682 corporations ought to fall to the community. The increment in truth represents part of corporate earnings, although commingled with inflation and stock market fluctuation. Under Louisiana law, the community's right to the earnings of the husband's separate assets is not decided by whether it pleases the husband to hold those assets in the form of low-dividend stock (which retains the bulk of earnings, increasing shareholder equity and thus market value) or high-dividend stock (which distributes the bulk of earnings). Corporate shares are unlike land, or gold bullion, which remain the same in both form and substance and take from their physical being their value (which changes only because of the market's evaluation). Corporate shares may remain the same in form, i. e., in paper certificates for a given number of shares, but they change in the substance they represent and they do not take their value from their physical being (the piece of printed or engraved paper). Thus the same paper shares that once represented, say, a 1% shareholder interest in a corporation having one factory and its stock of raw materials, etc., may now represent 1% interest in a corporation having two factories, the second having been acquired out of accumulated earnings from the first.
The rule of C.C. 2408 is that increase in separate property attributable to "common labor, expense or industry" is community, while increase attributable "only to the ordinary course of things, to the rise in the value of property, or to the chances of trade" is not. The long-range increase in market value of corporate shares is ordinarily attributable to both of those factors. If one must assign the entirety of the increase to separate or community estate, the law's positive command that separate fruits belong to the community, coupled with traditional theories that commingled assets become community, justifies assigning the entire increase to the community.[2]

On Application for Rehearing
Action on this application was withheld on request of the parties while they were attempting to negotiate a compromise.
We now correct our omission to rule on defendant's claim to half of the cash dividends on the corporate stock from date of physical separation until filing of the petition for divorce.
The net result of McMichael v. McMichael, 1967, 251 La. 654, 205 So.2d 533, cert. denied 393 U.S. 871, 89 S.Ct. 159, 21 L.Ed.2d 140, and Bynacker v. McMichael, La.App. 4 Cir. 1975, 310 So.2d 159, writ refused, La. 313 So.2d 835, is that a husband need not account to his wife for his own income (other than perfunctorily as to bonuses) while nonjudicially separated, notwithstanding that La.C.C. 2402 and 2334 might deem it community, in the absence of allegation that he has disposed of the income in order to injure the wife. See also Burger v. Burger, La.App. 4 Cir. 1978, 357 So.2d 1178.
As to income from community-owned corporate stock, however, half of that income must be attributed to the wife and the husband cannot spend that on himself. We agree that the husband must account to the wife for her half of community dividends, although he may be entitled to credit for part or all "paid" to her, e. g., in the form of alimony. We therefore amend our judgment to order such an accounting.
Rehearing is otherwise refused.
NOTES
[1] Presumably there are intermediate alternatives, such as partial ratification as to some stocks only, or as to the sale only and not the use of the proceeds.
[2] One hundred twenty-five shares were purchased in 1957, 25 were sold in 1959, and a 2-for-1 split occurred in 1960, leaving 200 shares.
[3] A 2-for-1 split occurred in 1969.
[4] Fifty shares were purchased with concededly community funds in 1956. In February 1957 five additional shares were purchased with community funds. Then 45 shares were purchased in late March 1957 with some of the proceeds of the Williams-McWilliams sale.
[5] Thus, out of the $37.98 proceeds of her portion of the 140 Virginia Electric we assign 37.98/5,515.25 of the 100 ITT, or .6886 shares, bought in that set of transactions. Also used to buy the ITT were the proceeds of 25 United Airline and 120 Consolidated Natural Gas. The 120 Consolidated were 100 separate and 20 community (100 separate gave rights for ten bought with community funds; a split gave another 110 [100 separate, ten community]; then one certificate for 100which had to be separatewas sold to buy Carter Wallace). So the wife's interest in those proceeds was 10/120 of $3,395.94, or $283, which is deemed to have paid for 283/5,515.25, of the 100 ITT, or 5.1312 shares. The UAL were community; the wife's half of their $1,214.22 proceeds was $607.11, which paid for 607.11/5,515.25 of the 100 ITT, or 11.0078 shares. Thus the wife's interest in this 100 ITT totals 16.8276 shares (.6886 + 5.1312 + 11.0078).
[6] Two 2-for-1 splits occurred, one in 1961 and the other in 1969. Four other shares were acquired through stock dividends. See (a) under Co-Owned, above.
[7] Twenty-five shares of United were sold in 1972 to help pay for 100 shares of ITT, and 50 shares were sold in 1973 to purchase 47 shares of GM.
[8] See discussion of separate nature of Central & Southwest, at (b) under Separate, above.
[9] Sixty-five shares were purchased in 1966 for $2,956.88, and a 2-for-1 split in 1968 increased the total to 130.
[10] Fifty shares were purchased in 1965 for $3,440.63, and a 2-for-1 split in 1966 increased the total to 100.
[11] Additionally, as the source of the cash was proceeds from the sale of RCA and Alcoa, community stocks, these shares are classified as community.
[12] Article 2408 states as follows:

"When the separate property of either the husband or the wife has been increased or improved during the marriage, the other spouse, or his or her heirs, shall be entitled to the reward of one half of the value of the increase or ameliorations, if it be proved that the increase or ameliorations he the result of the common labor, expenses or industry; but there shall be no reward due, if it be proved that the increase is due only to the ordinary course of things, to the rise in the value of property, or to the chances of trade." (Emphasis added.)
[13] The fee would have been due regardless of the enhancement. Thus, the fee did not result in the enhancement.
[14] This was accomplished by having Minna Lane intentionally and deliberately fail to consent to the Subchapter S election. Under federal tax law, this failure to consent voided the election.
[1] See also Guilott v. Guilott, La.App. 3 Cir. 1978, 361 So.2d 1271.
[2] Under the theory of C.C. 2408, the stocks may be treated as the separate property of the husband with the community being owed the increase, when the husband has kept the same stocks he owned before the marriage. But, under the theory of C.C. 2402 and C.C. 2334, when the husband has become a "trader", the stocks bought during the marriage with proceeds of the pre-marital stocks might be treated as acquisitions made during the community with commingled assets, thus making the stocks community with a debt owed to the husband's separate estate for its contribution towards the purchase of the community asset.